UNITED STATES of America,

v.

**Richard COPELAND, Defendant.**

No. 01–CR–1453.

United States District Court,
E.D. New York.

May 4, 2005.

Roslynn R. Mauskopf, United States Attorney, Brooklyn, NY By Scott Dunn, for the Government.

Michael Padden, Federal Defender's Division, Legal Aid Society, Brooklyn, NY, for the Defendant.

## MEMORANDUM, JUDGMENT AND ORDER

WEINSTEIN, Senior District Judge.

### Table of Contents

I. Introduction .................................................................. 278

II. Facts ....................................................................... 279
    A. Family History ......................................................... 279
    B. Criminal Conduct ...................................................... 279
    C. Deportation Hearings and Deportation ................................. 281
    D. Motion to Reopen ...................................................... 282
    E. Reentry into the United States and Charge of Illegal Reentry .......... 282
    F. Decision by District Court on Motion to Dismiss Indictment ............ 283
    G. Government's Appeal from Dismissal and Remand ...................... 283
        1. Court of Appeals Decision ........................................ 283
            a. Section 1326(d)(1): Exhaustion of Administrative Remedies ....... 283
            b. Section 1326(d)(2): Denial of Judicial Review ................... 284
            c. Section 1326(d)(3): Fundamental Unfairness ..................... 284

III. Law ........................................................................ 284
    A. Illegal Reentry and Collateral Attack ................................. 285
    B. Fundamental Unfairness of Entry of Deportation Order ................. 285
        1. Standard for Prejudice ........................................... 285
        2. Quantifying Prejudice ............................................ 286
    C. Means of Determining Prejudice: Balancing Positive and Negative Factors .................................................................. 288

D. Unusual or Outstanding Countervailing Equities ...........................289
E. Rehabilitation .....................................................................290
F. Cases Involving Similarly Situated Aliens ...................................290
   1. Court of Appeals Cases ..........................................291
     a. Illegal Reentry .............................................291
     b. Reviewing BIA Decisions ....................................293
   2. District Court Cases..............................................297
   3. Board of Immigration Appeals ...................................298
     a. Precedential Cases .........................................298
     b. Unpublished Cases .........................................305
     c. Challenge of "Actual Cases" ...............................308

IV. Evidence at Hearing ...............................................................312
A. Positive and Adverse Factors ...................................................312
   1. Mother: Ivy Johnson ...........................................312
   2. Uncle: Donald Johnson ........................................313
   3. Common Law Mother-in-Law: Beverly Lovell ................314
   4. Aunt: Cymlyn Chambers ......................................315
   5. Proffered Testimony of Monique Brown: Beverly Lovell ...............316
   6. Aunt: Alesia Yoyo ...............................................318
   7. Defendant: Richard Copeland .................................318
     a. Family History .............................................318
     b. Work History ..............................................319
     c. Common Law Wife and Children .............................319
     d. Criminal History ..........................................320
   8. Immigration Judge: Keith Williams ..........................325

V. Application of Law to Facts ......................................................334
A. Balancing Factors ................................................................334
   1. Generally ......................................................334
   2. Adverse Factors ...............................................335
     a. Nature of Exclusion Ground at Issue .......................335
     b. Presence of Additional Immigration Law Violations.................335
     c. Criminal Record and its Nature, Recency, and Seriousness ..........335
     d. Presence of Other Evidence of Bad Character .....................338
   3. Positive Factors ...............................................340
     a. Family Ties ................................................340
     b. Residence of Long Duration ................................341
     c. Arrival at a Young Age .....................................341
     d. Hardship to the Alien and His Family ......................341
     e. Armed Forces Service ......................................341
     f. Employment History .......................................341
     g. Community Service .........................................342
     h. Property or Business Ties ..................................342
     i. Other Evidence of Good Character .........................342
     j. Rehabilitation .............................................342
     k. Balancing .................................................342
   4. Actual Cases ..................................................342

VI. Conclusion .......................................................................343

## I. Introduction

This case raises the issue of how a district court can determine whether the fact that a deportee was denied due process in deportation hearings prejudiced him—*i.e.*, whether the result would not have been deportation if no constitutional violation had occurred. As indicated below, *see infra* Part III.F.3.c., a readily applied—and probably fairer—test would require the

defendant to prove only that his deportation resulted from a due process denial serious enough to make "the entry of the [deportation] order ... fundamentally unfair." 8 U.S.C. § 1326(d)(3).

The rule of law adopted by the United States Court of Appeals for the Second Circuit requires the district court to undertake the highly speculative task of determining whether, absent the constitutional violation, the immigration judge would have ordered the defendant deported. In effect, this enterprise necessitates a present reconstruction of a hypothetical deportation hearing in 1996. It requires the court to accurately predict, in the deportation context, what would have happened at another time, in another place, with different lawyers, and before another unknown judge, using variable and subjective factors.

An indictment charging Richard Copeland with illegal reentry into the United States was dismissed by this court based on a finding that the underlying prior ordered deportation was not consistent with due process. *See United States v. Copeland*, 228 F.Supp.2d 267 (E.D.N.Y.2002). Though the United States Court of Appeals for the Second Circuit was in agreement that due process had been denied, it nevertheless vacated dismissal of the indictment. *See United States v. Copeland*, 376 F.3d 61, 75 (2d Cir.2004). Concluding that the law required both denial of due process and a showing of prejudice before the dismissal of an illegal re-entry indictment, the Court of Appeals remanded the case to the district court for an evidentiary hearing and findings on the question of whether the fundamental procedural error in the defendant's deportation hearing had been prejudicial.

The court conducted a full evidentiary hearing. It finds that the defendant was not "prejudiced." The decision is based on a determination, by a standard of clear, unequivocal and convincing evidence—80% or more probability—that had the section 212(c) hearing and administrative appeal before deportation been properly conducted by an immigration judge, the defendant would have been ordered deported. Accordingly, the indictment is reinstated.

## II. Facts

### A. Family History

The defendant is a citizen of Jamaica. He was born on November 11, 1969. On July 21, 1982, when he was twelve years old, he entered the United States as a lawful permanent resident. His grandmother, a naturalized citizen, had adopted the defendant in 1978, and it was through her petition that the defendant was able to enter the country legally. He left only distant relatives in Jamaica and did not return there until 1998, upon his deportation at the age of 27. At the time of deportation, he resided in this country with his two children, Richard Copeland Jr. and Tyler Brown, then ages 11 and 4, and their mother, Monique Brown. The children and mother are United States citizens.

### B. Criminal Conduct

The defendant was convicted of four New York state crimes prior to his deportation: (1) disorderly conduct; (2) attempted criminal sale of a controlled substance in the third degree; (3) criminal possession of a weapon in the third degree; and (4) criminal possession of a weapon in the second degree. He was sentenced to three days imprisonment for the disorderly conduct conviction. He served the sentences for the three other crimes concurrently, from October 13, 1995 to September 23, 1998—just under three years.

The convictions themselves do not adequately reflect the severity of the criminal

activity. A more thorough chronology is required to place the crimes in context. At the time of Mr. Coreland's deportation hearing, it was not uncommon for immigration judges to conduct similar inquiries in assessing section 212(c) applications; they were authorized to go behind records of conviction to ascertain the underlying facts. *See, e.g., Matter of Roberts,* 20 I. & N. Dec. 294, 301 (BIA 1991) ("[I]nquiry may be had into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted [.][I]t is impermissible [however] to go behind a record of conviction to reassess an alien's ultimate guilt or innocence.").

On May 18, 1988, within six years of his admission into the United States, the defendant was arrested for grand larceny of a car, criminal possession of stolen property, and unauthorized use of a vehicle. At the time of his arrest, the defendant provided a social security number belonging to an unrelated individual residing in Buffalo. On September 16, 1988, having failed to appear for a scheduled court proceeding, a bench warrant was issued for his arrest. The defendant ultimately pled guilty to disorderly conduct, following his arrest on March 22, 1989.

The March 22, 1989 arrest was for criminal possession of a controlled substance and illegal possession of a firearm. The defendant again provided a false social security number. He also indicated that he was born in Trinidad and Tobago. The social security number provided by the defendant in that instance belonged to a woman residing in Brooklyn. When the defendant again failed to appear on the date set by the court, another warrant was issued for his arrest.

On February 9, 1993, the defendant was arrested and indicted on multiple counts related to the criminal sale and possession of controlled substances. At the time of his arrest, Richard Copeland indicated that his name was Rohan Brown, thereby avoiding detection as a fugitive on the March 1989 charges. At an evidentiary hearing before this court, defendant testified that he received probation, was told to report to the probation officer, but never did so out of concern that the probation officer would discover the outstanding warrant for his 1989 arrest. *See* Mar. 24, 2005 Hrg. Tr. at 84. As a result, another bench warrant was issued.

On September 16, 1995, the defendant was arrested for attempted murder, first degree attempted robbery, first and fourth degree assault, and criminal possession of a weapon in the second and third degrees. The conduct underlying the arrest involved serious violence. The defendant pulled a man from a car at gunpoint, demanded money, and shot him in the throat when he made an effort to escape. The victim was paralyzed as a result of the shot. At the time of his arrest, Richard Copeland indicated that his name was Richard Hyatt, and falsely claimed to be a United States citizen.

Following his fourth arrest, the state sought convictions for the charges which he had evaded while a fugitive for more than six and one-half years. On October 13, 1995, the defendant pled guilty to criminal possession of a weapon in the third degree, based on his March 22, 1989 arrest. He was sentenced to a year in prison. On October 16, 1995, he pled guilty to attempted criminal sale of a controlled substance in the third degree, based on his 1993 arrest, and was sentenced to one year. On October 27, 1995, the defendant pled guilty to criminal possession of a weapon in the second degree, relating to his arrest for the September 16, 1995 shooting. He was sentenced to 1½ to 4½ years in prison. Copeland served his

three felony sentences concurrently; all resulted from guilty pleas.

### C. Deportation Hearings and Deportation

While the defendant was incarcerated, the INS initiated deportation proceedings based on his conviction for the February 9, 1993 attempted criminal sale of a controlled substance. A hearing was conducted before an Immigration Judge ("IJ") on August 7 and November 27, 1996. At the August hearing, the IJ informed the defendant that he had a right to an attorney and that he was entitled to appeal any decision by the IJ within 30 days of a decision. The IJ also told the defendant that because he was an alien, he would be deportable if the INS proved that he had been convicted of attempted sale of a controlled substance. The IJ stated that "[u]nder current law there is no waiver for deportability if you're, [sic] had been convicted of, of violation of a controlled substance law," because "the law changed April 1996 a couple a months ago ... and the new law says if you have a conviction for narcotics you're not eligible for any form of relief."

The defendant apparently attempted to ask whether the date of his conviction would have an effect on his eligibility for a waiver of deportation by suggesting that he had committed the crimes and had been convicted before adoption of the new provision:

> COPELAND: So, so that law it, it all depends umm ... if it was before April 19 ...
>
> JUDGE: It doesn't depend on when the crime was com...
>
> COPELAND: Oh?
>
> JUDGE: No! No! Goes by whether ... if you have ...
>
> COPELAND: ... (unintelligible) ... what's in your record.

> JUDGE: Right. Alright, that's what the law says now. As if and it says that. Okay? But speak to lawyers about it ....

The IJ then adjourned the hearing for three months to give the defendant time to find an attorney.

When the hearing resumed on November 27, 1996, the defendant again appeared *pro se.* He admitted that he was not a citizen of the United States, that he was a citizen of Jamaica, and that he had been convicted of an attempted criminal sale of a controlled substance on September 27, 1993. The IJ found the defendant "deportable from the United States as charged." The following colloquy then occurred:

> JUDGE: There's no relief available to you anymore because the law changed in April. And the new law said that if you have a conviction for a controlled substances [sic] you're deportable and there's no relief. So I feel I have no alternative but to order you deported to Jamaica. You could accept this decision as a final decision or you can appeal my decision. Which do you prefer to do?
>
> COPELAND: I will accept this decision.

The defendant did not file an appeal with the Board of Immigration Appeals ("BIA") within the 30 day time limit. He remained in the United States because of his incarceration.

The "new law" referred to by the IJ was actually two laws: the Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, enacted on April 24, 1996, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546, enacted on September 30, 1996 (collectively, "the 1996 Amendments"), which amended the Immigration and Nationality

Act ("INA"), 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.*

Prior to these amendments, the Attorney General had broad discretion to cancel deportation orders for aliens who met certain residence requirements and had not served five years in prison for an aggravated felony. (Recall that defendant served considerably less than five years in total.) *See* 8 U.S.C. § 1182(c) (repealed 1996); *INS v. St. Cyr*, 533 U.S. 289, 296–97, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). AEDPA amended section 1182(c) to render aliens who pled guilty to aggravated felonies ineligible for section 212(c) discretionary relief from deportation. *See* AEDPA § 440(d). IIRIRA then repealed section 212(c), *see* IIRIRA § 304(b), replacing it with a new section granting the Attorney General authority to cancel removal only for a narrowly defined class of inadmissible or deportable aliens, not including persons "convicted of any aggravated felony." *Id.*

At the time of the defendant's deportation hearing, the BIA's position was that the 1996 Amendments applied retroactively to non-citizens, like him, who, prior to their enactment, had pled guilty to aggravated felonies. *See In re Soriano*, 21 I. & N. Dec. 516, 534, 1996 WL 426888 (BIA June 27, 1996), *vacated on other grounds*, 1997 WL 33347804 (Op. Atty Gen. Feb. 21, 1997). The IJ's statement to the defendant that new laws had rendered him ineligible for relief was based on *Soriano.*

During 1997 and 1998, however, several courts in this circuit and elsewhere ruled that Section 440(d) could not be applied retroactively in Copeland's circumstances. The Supreme Court eventually agreed, holding that Section 440(d) could not be applied retroactively to aliens who pled guilty to crimes prior to 1996 that made them ineligible for Section 212(c) relief under the 1996 Amendments.

*United States v. Copeland,* 376 F.3d 61 (2d Cir.2004) (citations omitted).

### D. Motion to Reopen

On September 22, 1998, following his deportation hearing, but before the *St. Cyr* decision, the defendant filed a motion to reopen the proceedings and for a stay of deportation under section 212(c). He based his motion in part on the argument that the IJ had breached his obligation, under section 242.17(a) of Title 8 of the Code of Federal Regulations, to inform him of his eligibility for section 212(c) relief. The same IJ denied the defendant's *motion to reopen on* the ground that, although section 212(c) relief remained available to aliens whose deportation proceedings began prior to the passage of AEDPA, the defendant was ineligible for section 212(c) relief because his deportation proceedings began after its passage.

The defendant appealed the IJ's decision to the BIA on October 6, 1998. He argued that he was eligible for section 212(c) relief. On November 23, 1998, *before the BIA had considered his appeal,* he was deported to Jamaica. On May 25, 1999, the BIA dismissed the defendant's appeal as moot under section 3.6(b) of Title 8 of the Code of Federal Regulations because he had already been deported.

### E. Reentry into the United States and Charge of Illegal Reentry

The defendant reentered the United States by February 22, 1999, at the latest. On December 1, 2001, he was arrested. He was indicted for illegal reentry. 8 U.S.C. §§ 1326(a), (b)(2); 18 U.S.C. § 3551 *et seq.* On March 27, 2002, the defendant moved to dismiss the indictment on the grounds that his deportation order, an ele-

ment of the crime of illegal reentry, was invalid.

### F. Decision by District Court on Motion to Dismiss Indictment

At a hearing before this court, the defendant argued that he was inaccurately advised of his right to appeal when the IJ incorrectly told him that no relief was available because of the 1996 Amendments. The district court scheduled another hearing to determine whether the defendant "really didn't appreciate that he had a right to appeal[,] having been overborne" by the IJ. At that hearing, the court listened to tapes of the defendant's deportation hearings, heard testimony from an INS agent about the defendant's criminal history, and inquired about defendant's age and education at the time of his deportation hearing. The court found that the defendant's will was not overborne and that he made a rational decision not to appeal based upon the advice he had then received, even though it ultimately turned out to be incorrect. The court also found that the IJ effectively indicated to the defendant that an appeal would be futile, and that the defendant rationally decided not to waste his effort by appealing.

The district court dismissed the indictment on the ground that the underlying deportation order violated the defendant's due process rights and therefore could not be the basis for the prior deportation element in the illegal reentry charge. *United States v. Copeland*, 228 F.Supp.2d 267, 272 (E.D.N.Y.2002). It noted that, under section 1326(d), a deportation order could be collaterally challenged in an illegal reentry case if the non-citizen defendant: (1) exhausted administrative remedies; (2) was deprived of the opportunity for judicial review; and (3) showed that the proceeding was fundamentally unfair. *Id.* at 270 (citing 8 U.S.C. § 1326(d)). The defendant

was deemed to have satisfied the exhaustion requirement based on the conclusion that, though he had not appealed to the BIA, any attempt to do so would have been futile, given the then-current BIA interpretation of AEDPA. *Id.* at 271. The court concluded that the defendant was denied judicial review because the applicable transitional rules of the IIRIRA barred direct judicial review of deportation orders against aliens deported for narcotics offenses. *Id.* Finally, the defendant's deportation order was found to be "fundamentally unfair" because the IJ "not only failed to advise the defendant of the existence of discretionary relief, but affirmatively misled him by indicating he was ineligible for such relief." *Id.* at 271–72. The court concluded that this unfairness was prejudicial to the defendant because there was a "reasonable likelihood" that he would have been granted section 212(c) relief. *Id.* Finding that the requirements of section 1326(d) were satisfied, this court dismissed the indictment.

### G. Government's Appeal from Dismissal and Remand

#### 1. Court of Appeals Decision

##### a. Section 1326(d)(1): Exhaustion of Administrative Remedies

The district court had found that since an appeal to the BIA would have been futile in light of *Soriano*, the defendant had sufficiently fulfilled the exhaustion requirement of section 1326(d)(1). The Court of Appeals for the Second Circuit noted that it had since held that there is no futility exception, with one minor qualification, to statutory exhaustion requirements. *Copeland*, 376 F.3d at 66. It concluded, however, that under its caselaw, the motion to reopen the deportation hearing and the defendant's appeal from the denial of that motion satisfied the exhaustion requirement of section 1326(d). *Id.* at 67.

b. Section 1326(d)(2): Denial of Judicial Review

The Court of Appeals agreed with the district court that under section 1326(d)(2) the defendant was required to demonstrate that he was denied an opportunity for judicial review. The district court had determined that the defendant was denied judicial review because the applicable transitional rules of IIRIRA barred direct judicial review of deportation orders against aliens deported for narcotics offenses. The Court of Appeals noted that the defendant nevertheless may have had the right to seek judicial relief "by way of habeas corpus." *Id.* at 68.

It ultimately concluded that where habeas review is potentially available, an opportunity for judicial review will still be deemed to have been denied where the interval between entry of the final deportation order and the physical deportation is too brief to afford a realistic possibility of filing a habeas petition. *See id.* at 69. It reasoned that where no realistic opportunity for judicial review by way of habeas review existed, an alien's failure to seek such review should not be deemed to preclude a collateral attack on a deportation order under section 1326(d)(2). The appellate court concluded that "[i]n the present case, Copeland had no realistic opportunity for habeas review not only because of the lack of time but also because of the legal uncertainties as to the availability of habeas review." *Copeland,* 376 F.3d at 69. It held that "Copeland's resort to administrative remedies was not unreasonable" and that "his opportunity for habeas review was not sufficiently realistic to bar him from challenging the validity of the deportation order." *Id.* at 70.

c. Section 1326(d)(3): Fundamental Unfairness

The Court of Appeals ruled that a failure to advise a potential deportee of a right to seek section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of section 1326(d)(3). *Copeland,* 376 F.3d at 71. It stated that "[p]rejudice is shown where 'defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred.'" *Id.* at 73 (citing *United States v. Fernandez–Antonia,* 278 F.3d 150, 159 (2d Cir.2002)). The court stated that the defendant would have to "show that he likely would have been granted Section 212(c) relief if he had obtained a hearing." 376 F.3d at 73. Vacating the dismissal of the defendant's indictment and remanding to the district court for an evidentiary hearing to determine "prejudice" to the deportee, the Court of Appeals declared:

Because the parties to the present matter could not have anticipated the precise nature of our decision, it would not be appropriate for us to review the district court's finding of prejudice on the present record. Specifically, although the record includes comprehensive evidence of Copeland's criminal history, there is little detail about Copeland's family relationships or other potentially favorable considerations. Such evidence would be essential to any finding that Copeland was prejudiced by the lack of a Section 212(c) hearing, given the fact that Copeland's criminal record is quite serious.... We therefore *remand* for findings based on a full record—supplemented if necessary by an evidentiary hearing—*on the question of whether Copeland was prejudiced by the IJ's failure to advise him of his right to seek 212(c) relief.*

376 F.3d at 61 (emphasis added).

## III. Law

### A. Illegal Reentry and Collateral Attack

█ Section 1326(a) of Title 8 of the United States Code makes it a crime for a

deported or removed non-citizen to enter or be found in the United States without the express consent of the Attorney General. Deportation proceedings are not valid and cannot be used to establish a prior order of deportation for purposes of a criminal prosecution if the proceedings failed to afford the non-citizen due process of law. *See United States v. Mendoza–Lopez*, 481 U.S. 828, 839 n. 15, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987) ("Even with this safeguard, the use of the result of an administrative proceeding to establish an element of a criminal offense is troubling."); *see also United States v. Gonzalez–Roque*, 301 F.3d 39, 45 (2d Cir.2002).

A non-citizen charged with a violation of section 1326 may collaterally attack the validity of a prior deportation order since it is a necessary element of the charged criminal offense. *See* 8 U.S.C. § 1326(d). Such a collateral challenge can be sustained if:

1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

3) the entry of the order was fundamentally unfair.

*See id.* As previously noted, the Court of Appeals held that the defendant satisfied prong one of section 1326(d) by moving to reopen his deportation hearing and appealing the denial of that motion. *See* 376 F.3d at 67. It held that the defendant satisfied prong two by resorting to administrative remedies, where his opportunity for habeas review was not sufficiently realistic to bar him from challenging the validity of the deportation order. *Id.* at 70. The section 1326 question before the court on remand concerns only the third prong, whether the entry of the order was fundamentally unfair and prejudicial.

**B.  Fundamental Unfairness of Entry of Deportation Order**

1.  Standard for Prejudice

■ An alien attempting to demonstrate on collateral review "that his [deportation] hearing was so fundamentally unfair that it constituted a denial of his Fifth Amendment right to due process ... *must show both a fundamental procedural error AND prejudice resulting from that error.*" *United States v. Fernandez–Antonia*, 278 F.3d 150, 159 (2d Cir.2002) (emphasis added).

■ Prejudice is shown where "defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred." *Id.* (internal quotation marks and citation omitted). To satisfy the standard the defendant "must show that he *likely* would have been granted Section 212(c) relief if he had obtained a hearing." *Copeland*, 376 F.3d at 73 (emphasis added). The Court of Appeals did not say what degree of "likelihood," *i.e.* what probability, must be established. It observed that "[w]e have not decided what level of proof is required for a showing that an alien likely would not have been removed, but we have flirted with two possible standards: a 'reasonable likelihood' and a 'plausible showing.'" *Id.*

It concluded that prejudice is shown where there is a "reasonable probability" that the deportation at issue would not have been ordered absent the error complained of.

In our view ... the appropriate test for prejudice is the one used to decide ineffective assistance of counsel claims, namely, prejudice is shown where "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This analogy is close-fitting because the denial of an opportunity to apply for Section 212(c) relief will generally be the result either of a lawyer having caused an eligible alien to fail to apply, *United States v. Perez*, 330 F.3d 97, 104 (2d Cir.2003), or of an IJ, owing special duties to a *pro se* alien, having failed to give notice of such an opportunity, . . . . In the latter case, therefore, *prejudice is shown where there is a reasonable probability that, but for the IJ's unprofessional errors, the alien would have been granted Section 212(c) relief.*

*Id.* (emphasis added). Subsequently, in *United States v. Scott*, 394 F.3d 111 (2d Cir.2005), the Court of Appeals expanded *Copeland*'s prejudice analysis by equating "reasonable probability" with "a probability sufficient to undermine confidence in the outcome."

Recently, in *Copeland*, we clarified that "prejudice" in the context of § 1326(d) is shown where there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different. As the Supreme Court has defined it, a reasonable probability is a probability sufficient to undermine confidence in the outcome. Is there a "reasonable probability" that [the defendant] would have received a waiver of deportation [at a hearing for] § 212(c) relief in 1996?

*Id.* at 118 (emphasis in original).

2. Quantifying Prejudice

Typically, courts have not quantified burdens of proof. *See* J. MAGUIRE, J. CHADBOURN, J. MANSFIELD, ET AL., CASES AND MATERIALS ON EVIDENCE 871–73 (6th ed.1973) (collecting literature on quantification of burdens of proof); RICHARD H. GASKINS, BURDENS OF PROOF IN MODERN DISCOURSE 20 (1992) (discussing implications of burdens of proof); TERENCE ANDERSON & WILLIAM TWINING, ANALYSIS OF EVIDENCE 338 (1991) (correlating verbal and mathematical measures of certainty and doubt).

The term "reasonable probability" should be quantified to the extent possible, given the difficulty of assessing what another adjudicator would have done when applying complex and subjective criteria. One of the most astute observers of problems of proof has emphasized the importance of attempting to set standards of probability in deciding whether fact-finding burdens have been met. He wrote:

The possible frailty of the fact-finding process in adjudication is an important and complex problem. It threatens to corrode public confidence in a vital part of the legal system; it raises significant moral, ethical, and legal issues . . .; it raises the possibility that legal rules cannot be efficiently or effectively administered and implemented; and it raises broader questions about the fairness, morality, acceptability, and efficiency of matters such as the legislative process and administrative rule-making proceedings. The problem of evidence and uncertainty is not simply a "technical" or "abstract" one. However one proposes to deal with the problem of uncertain inference—whether by "abstract" models, by "common sense" reasoning, by dismissing it as unmanageable by rational analysis, or in some other way—what one thinks about probability and inference in [adjudication] profoundly affects what one thinks about the "rule of law."

Peter Tillers, *Introduction to the Boston University School of Law Symposium on*

*Probability and Inference in the Law of Evidence*, 66 B.U. L. Rev. 381, 381–82 (1986). Agreement on quantification, while not a solution, does help move beyond the mere anecdotal to at least a rough consensus in application.

Quantification requires analysis in terms of probability. *Cf.* Anne W. Martin & David A. Schum, *Quantifying Burdens of Proof: A Likelihood Ratio Approach*, 27 Jurimetrics J. 383 (1987); Peter Tillers & David A. Schum, *Charting New Territory in Judicial Proof: Beyond Wigmore*, 9 Cardozo L. Rev. 907, 910 (1988) ("The primary motivation for the use of most mathematical models of proof is to facilitate consistent thinking about very complex problems.").

While "reasonable probability," the term of art selected by the Court of Appeals, seems deliberately designed to be fuzzy in concept and articulation, it is suggested that a probability of 20%—the approximate inverse of "clear, unequivocal and convincing evidence"—represents a sensible and enforceable standard, considering that deportation often has such serious consequences for the deportee and his or her family.

It has been said that,

[t]ime is irreversible, events unique, and any reconstruction of the past at best an approximation. As a result of this lack of certainty about what happened, it is inescapable that the trier's conclusions be based on probabilities.

J. Maguire, J. Chadbourn, J. Mansfield, Et Al., Cases and Materials on Evidence 1 (6th ed.1973). *See also United States v. Fatico*, 458 F.Supp. 388 (E.D.N.Y.1978). In *Fatico*, the court noted: "Quantified, the preponderance standard would be 50% probable. . . . [T]he probabilities might be in the order of above 70% under a clear and convincing evidence burden. . . . In terms of percentages, the probabilities for clear, unequivocal and convincing evidence might be in the order of 80% under this standard." 458 F.Supp. at 405. *See also Id.* at 411 (concluding that "clear, unequivocal and convincing evidence" means a probability of "about 80%"). *Cf. United States v. Shonubi*, 895 F.Supp. 460, 514 (E.D.N.Y.1995) ("[Non-statistical] evidence offers nothing more than a basis for conclusions about a perceived balance of probabilities."), *rev'd*, 103 F.3d 1085, 1092 (2d Cir.1997) ("Though [the district court's] comprehensive opinion is a valuable addition to the legal literature on the subject of evidence in particular and judicial decisionmaking in general, we conclude that he relied on evidence beyond the category of 'specific evidence' that our prior opinion ruled was required for determination of a 'relevant conduct' drug quantity for purposes of imposing a criminal sentence."); Peter Tillers, *Introduction: Three Contributions to Three Important Problems in Evidence Scholarship*, 18 Cardozo L. Rev. 1875, 1884 (1997) ("One possible way to make sense out of [the opinion of the Court of Appeals in *Shonubi* ] is to view it as a condemnation of statistical evidence in general. . . . But there are . . . problems with the view that [the opinion] is, at bottom, a repudiation of statistical evidence and statistical methods. [For instance, the Court of Appeals for the Second Circuit] seems to accept the use of statistics and statistical methods for [related] purposes . . . .").

When, as here, a relatively "simple fact"—what happened in the real world of defendant's life—is combined with what an unknown administrative judge would have done in evaluating the evidence supporting that finding of "fact," and analyzing the "fact" in the context of a "legal rule," the problem of determining how the judge would have decided the "law-fact" issue is complex. It is compounded by many factors—among them the egocentricity of the

judge. At most a band of probabilities is all that we can expect. Since the defendant's constitutional rights have been violated he is entitled, it is submitted, to the most favorable band border—here, it is proposed, 20%. An attempt to quantify in order to provide some uniformity in application of the rule is justified even though it must be conceded that the percentage chosen is based on public policy favoring enforcement of constitutional rights and somewhat arbitrary.

■ The present illegal reentry case involves a potentially unconstitutional deportation of great consequence to a deportee-defendant:

> To be sure, a deportation proceeding is not a criminal prosecution. But it does not syllogistically follow that a person may be banished from this country upon no higher degree of proof than applies in a negligence case. This Court has not closed its eyes to the drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification.

*Woodby v. Immigration & Naturalization Serv.*, 385 U.S. 276, 285, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). Unlike a standard deportation case, which would be nominally civil, this case also involves a criminal prosecution. Requiring a petitioner to meet a burden greater than 20% to establish a "reasonable probability" that he would have been granted section 212(c) relief would therefore seem unfair and unreasonable.

C. Means of Determining Prejudice: Balancing Positive and Negative Factors

To establish prejudice, the defendant must show that there is a "reasonable probability" that he would have received section 212(c) relief. Former section 212(c) allowed non-citizens in removal proceedings meeting the statutory criteria to apply for a discretionary waiver of deportation. *See* 8 U.S.C. § 1182(c) (1994). To qualify for such relief, an alien was required to show that he or she: (1) was a lawful permanent resident of the United States; (2) had an unrelinquished domicile of seven consecutive years; and (3) had not committed an aggravated felony for which he or she had served a term of at least five years. *See id.* The Attorney General could exercise discretion to waive deportation of an alien who satisfied these criteria. In the years leading up to 1996, the year the defendant received his deportation hearing, over half of the applications for 212(c) relief were granted. *See INS v. St. Cyr*, 533 U.S. 289, 296 n. 5, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

A pre-1996 section 212(c) determination involved a balancing of "the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of section 212(c) relief appear[ed] in the best interests of this country." *Matter of Marin*, 16 I. & N. Dec. 581, 584 (BIA 1978); *accord Douglas v. INS*, 28 F.3d 241, 244 (2d Cir.1994).

Adverse factors included the nature and underlying circumstances of the exclusion ground at issue, the presence of additional significant immigration law violations, the existence of a criminal record and its nature, recency and seriousness, and the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident. *See Marin*, 16 I. & N. Dec. at 584.

Favorable factors included family ties within this country, residence of long duration in the United States, arrival in the country at a young age, evidence of hard-

ship to the non-citizen and the non-citizen's family upon deportation, Armed Forces service, employment history, community service, property or business ties, other evidence attesting to good character, and, in the case of an alien convicted of criminal conduct, proof of genuine rehabilitation. *See id.* at 585.

> Resolution of the prejudice issue ... is somewhat akin to a trial within a trial. The district court must determine whether there is a reasonable probability that the alien would have obtained relief had he or she been informed of, and sought, a Section 212(c) hearing. The court must first obtain all of the facts relevant to the particular alien and then apply standards established under Section 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief.

*Copeland,* 376 F.3d at 73–74.

### D. Unusual or Outstanding Countervailing Equities

The Court of Appeals noted in *Copeland* that "[w]here ... an alien is deportable by reason of two narcotics convictions, the alien must make a showing of unusual or outstanding countervailing equities to obtain a waiver of deportation." *Id.* at 74 (citing *Lovell v. INS,* 52 F.3d 458, 461 (2d Cir.1995)).

> The necessity of demonstrating unusual or outstanding equities is not exclusively triggered by serious crimes involving controlled substances, however. Rather, as [was] indicated in *Marin,* one must examine the gravity of the offense, *per se.* In addition, such a showing may be mandated because of a single serious crime, as in *Marin,* or because of a succession of criminal acts, which together establish a pattern of serious criminal misconduct. Finally, we observe that an alien who demonstrates

unusual or outstanding equities, as required, merely satisfies the threshold test for having a favorable exercise of discretion considered in his case; such a showing does not compel that discretion be exercised in his favor.

*Matter of Buscemi,* 19 I. & N. Dec. 628, 633–34 (BIA 1988). *See also Montilla v. INS,* 926 F.2d 162, 170 (2d Cir.1991) ("We recognize that petitioner's chances on remand may be slim because of the high standard he must meet as a narcotics offender to be entitled to a waiver of deportation under § 212(c) of the Act."). In *Montilla,* the Court of Appeals for the Second Circuit embraced the BIA's requirement of a showing of unusual or outstanding countervailing equities in the case of an individual convicted of even one serious drug offense. *See id.*

The BIA has found, *inter alia,* family ties, long residence in the country, arrival at a young age, emotional hardship to family members upon deportation, gainful employment and difficult childhood experiences to constitute unusual or outstanding equities. *See Matter of Buscemi,* 19 I. & N. Dec. at 634 ("In his favor, the respondent has shown that he has resided in this country for some 17 years and that such residence began at a young age. Moreover, the record reflects that the respondent's entire immediate family resides in this country either as United States citizens or lawful permanent residents. Furthermore, the respondent has demonstrated that he is closely tied to his family and that all would suffer emotional hardship if the respondent were deported. Finally, we note that the respondent appears to have a history of gainful employment and that he was forced to grow up under difficult circumstances. We consider these to be outstanding equities, particularly with regard to the respondent's 17 years of residence in this country since age 9.").

As illustrated by *Matter of Buscemi*, the presence of unusual or outstanding countervailing equities will not necessarily outweigh adverse factors. *See, e.g., Zaluski v. INS*, 37 F.3d 72, 74 (2d Cir.1994) (affirming BIA's holding that defendant's "repeated criminal violations constitute a serious adverse discretionary factor," and that, "[w]hile his equities, including lengthy residence, hardship to himself and to his family, and employment ties to the United States rise to the level of outstanding and unusual, . . . they are insufficient to outweigh the seriousness of his criminal activity.").

### E. Rehabilitation

"[S]ection 212(c) applications involving convicted aliens must be evaluated on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion." *Matter of Roberts*, 20 I. & N. Dec. 294, 299 (BIA 1991) (considering rehabilitation to be a "significant discretionary factor."). A clear showing of rehabilitation, however, is not an absolute prerequisite to a favorable exercise of discretion in every section 212(c) application involving an alien with a criminal record. *See Matter of Edwards*, 20 I. & N. Dec. 191, 196 (BIA 1990) ("To the extent that [prior] language may be read as creating an absolute prerequisite to a favorable exercise of discretion, we withdraw from it. Rather, section 212(c) applications involving convicted aliens must be evaluated on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion.").

### F. Cases Involving Similarly Situated Aliens

The Court of Appeals instructed the district court in the instant case to "tak[e] into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." *Copeland*, 376 F.3d at 74. The examination of these cases was to be informed by the Supreme Court's broad observation that "over half of all [contemporaneous] 212(c) applications [were] granted." *Id.* (citing *St. Cyr*, 533 U.S. at 296 n. 5, 121 S.Ct. 2271).

Actual cases were as myriad as the differences in the backgrounds of those seeking section 212(c) relief. Much depended on the particular administrative judge and the dedication and skill of the lawyer assembling his or her client's favorable data. As one experienced attorney explained,

> I'm an attorney with the Legal Aid Society, the only free legal-service organization in New York City that provides assistance to people who are [being deported] because of a criminal conviction.
>
> .     .     .     .     .
>
> In 1986 we deported just under 2,000 immigrants per year for criminal offenses. Last year that number was 79,-000. . . . Many of the people being deported have lived here for a long time. Some came here as babies and now have spouses and children. Some have never even seen their native countries. . . .
>
> I used to be able to leave my work at the office. But now when I'm with my family, my mind is constantly on what I am going to do Monday for this person. I wake up in the middle of the night thinking about a client. I used to paint portraits. I don't do that anymore. . . . In the beginning, I could detach, but when you start getting calls from a guy who's crying uncontrollably and all he's talking about is his kids—you know?

Bryan Lonegan, *My Hands are Tied*, N.Y. TIMES, Nov. 7, 2004. Much appears to have turned on the luck of the draw and the personal view of the hearing officer. *See* Maurice A. Roberts, *The Exercise of Administrative Discretion Under the Im-*

*migration Laws*, 13 SAN DIEGO L. REV. 144, 146–47 (1975) ("Theoretically, the evidence submitted ... is weighed objectively and dispassionately and appropriate fact findings are made on the basis of the persuasiveness of the evidence. Realistically, and especially where the proofs are conflicting, the appraisal of the evidence frequently involves a value judgment, in which the subjective attitudes of the adjudicator can often play a decisive part."). The effect of a given immigration judge's attitude toward non-citizens, particularly those convicted of crimes, cannot be underestimated. *See id.* at 165.

The Court of Appeals has directed a backward-looking theoretical inquiry into what likely would have happened had the defendant in the case now before this court been able to seek section 212(c) relief. The review of actual cases, decided by immigration judges and the Board of Immigration Appeals, as well as by the Court of Appeals for the Second Circuit and the district courts, is instructive.

1. Court of Appeals Cases

a. Illegal Reentry

In *United States v. Scott*, 394 F.3d 111 (2d Cir.2005), the Court of Appeals for this circuit reversed a conviction of illegal reentry into the United States, holding that the district court erred in denying the defendant's motion to dismiss the indictment on the ground that the underlying deportation order was invalid. In determining whether the defendant was prejudiced by the error in his deportation proceedings, the Court of Appeals reasoned as follows:

Several factors would have weighed in favor of granting § 212(c) relief to Scott in 1996—fifteen years of residence in New York, strong family ties to New York, young age of lawful arrival in [the] United States, and employment and education in New York. According to Scott,

his mother would also have testified that he is a "good father and a good husband," a "nice caring person" who is "willing to help and very considerate," and that he was physically abused as a child.

Although the parties dispute the degree of rehabilitation a defendant-alien must achieve, Scott makes a legitimate claim under any reasonable standard that he could have persuaded an IJ in 1996 that he was rehabilitated, given his successful completion of the [New York State Shock Incarceration Program].

Scott's criminal record as of 1996 would undoubtedly have weighed against § 212(c) relief. Prior to being ordered deported in 1996, Scott had four convictions, for which he was sentenced to five years of probation, three days of community service, two to four years imprisonment, and three to six years of imprisonment, respectively. In *Perez*, we found that the alien could have made a strong showing for § 212(c) relief despite his single conviction for a drug trafficking offense, for which he was sentenced to six months' imprisonment. Although Scott has a lengthier criminal history than Perez, Scott's multiple [automobile theft related] crimes were neither violent nor drug-related. Hence, as in *Perez*, Scott's criminal record would not have precluded § 212(c) relief.

There is some indication, as the district court suggested, that, given his "lengthy criminal history," Scott may have been required to show "unusual or outstanding equities" in his favor. However, an alien's strong family ties to the United States in addition to his extensive educational and employment histories in the United States have, on occasion, been held to outweigh a single conviction of third degree drug possession, a crime more serious than any of

Scott's. Therefore, we are persuaded that Scott's multiple convictions for lesser crimes would not have outweighed his strong ties to the United States.

*Id.* at 120–21. The defendant in *Scott* had been convicted of grand larceny, after being seen putting a motorcycle into a stolen van, criminal possession of stolen property, after reportedly selling two stolen vehicles to an undercover officer, possession of burglar's tools, after being arrested for attempted auto theft, a separate charge of grand larceny, illegal possession of vehicle identification plates, and criminal possession of stolen property. The Court of Appeals held that the district court erred in considering certain *ex post* data in determining prejudice. Even considering only the information available at the time of the deportation order, as recognized by the Court of Appeals, the defendant had a "lengthy criminal history."

In *United States v. Calderon*, 391 F.3d 370 (2d Cir.2004), a defendant moved to dismiss an indictment charging him with criminal reentry into the country. This court dismissed the indictment and the Court of Appeals affirmed its dismissal. Mr. Calderon had entered the United States in 1988 and become a lawful permanent resident in 1990. In 1994, he pled guilty to the possession of a controlled substance with intent to distribute and was sentenced to probation for 3 years with the condition that he serve 180 days in prison. In 1998 he was convicted of criminal mischief and assault by automobile and sentenced to a term of imprisonment of 30 days. The court found that the defendant could "make a plausible showing that had he been granted a section 212(c) hearing, he would not have been deported, and that the proceeding was fundamentally unfair." *Id.* at 376 (internal quotations and citation omitted). Specifically, the district court had found:

Mr. Calderon can make a plausible showing that had he been granted a section 212(c) hearing, he would not have been deported. He has strong ties to the United States. He lived in the United States legally for approximately ten years. His wife is a long-time lawful permanent resident. He had full custody of his son, a United States citizen. His criminal history is comparatively less serious, and he does not appear to have a history of immigration law violations. Arguably, he was, on the whole, a productive member of the United States community.

*United States v. Calderon*, 2003 WL 1338943, at *7 (E.D.N.Y.2003). The United States Court of Appeals for the Second Circuit concluded that the finding was not clearly erroneous and that there was no reason to disturb it. *Calderon*, 391 F.3d at 376.

In *United States v. Perez*, 330 F.3d 97 (2d Cir.2003), the Court of Appeals considered the case of a defendant whose attempted illegal reentry charge was dismissed by the district court on the grounds of an invalid underlying deportation. The district court had held that the failure of defendant's counsel to file an application for discretionary relief amounted to ineffective assistance of counsel. *See United States v. Perez*, 213 F.Supp.2d 229, 235 (E.D.N.Y.2002) ("In a case at the verge of fundamental unfairness, which could lead to a serious criminal prosecution and a long prison term, due process should be interpreted generously to protect the accused. An alien is not entitled to any less due process protection than a citizen especially in a proceeding so important as one which could lead to the devastating punishment to himself and his family of separation from home and loved ones by deportation.").

The Court of Appeals affirmed the district court's finding that the defendant had shown his deportation proceedings to be fundamentally unfair as a result of counsel's ineffectiveness. *Perez*, 330 F.3d at 104. It concluded that Perez had "shown prejudice because he [showed] that he was eligible for § 212(c) relief and that he could have made a strong showing in support of his application for such relief." *Id.* at 102. The Court of Appeals applied the *Marin* balancing test, weighing both positive and negative factors:

[S]everal factors weighed in Perez's favor: he had a steady history of employment, a wife who was a permanent resident, and a son who was a United States citizen. The government does not claim that any negative factors other than his [single] conviction [for attempted sale of a controlled substance] would have weighed against him at the time of his deportation. Accordingly, Perez could have made a strong showing in favor of § 212(c) relief.

*Id.*

b. Reviewing BIA Decisions

The United States Court of Appeals for the Second Circuit reviewed section 212(c) decisions by the Board of Immigration Appeals for abuse of discretion, a much higher burden than the "likelihood" standard it imposes in the instant case. *See, e.g., Douglas v. INS*, 28 F.3d 241, 243 (2d Cir. 1994) ("We review the BIA's denial of a section 212(c) application for an abuse of discretion."). A denial of a section 212(c) application was deemed to constitute an abuse of discretion "only if it was 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group.'" *Id.* (citing *Arango–Aradondo v. INS*, 13 F.3d 610, 613 (2d Cir.1994)).

*Douglas* involved a non-citizen who was admitted to the United States as a lawful permanent resident when he was sixteen years old. All of his immediate relatives resided in the United States and were United States citizens. Four years after his admission to the country, Douglas pled guilty to criminal possession of cocaine. That conviction served to aggravate an already lengthy criminal record. The INS initiated deportation proceedings based on the drug offense. Douglas then appealed to the BIA, arguing, *inter alia*, that the IJ had abused his discretion in denying the section 212(c) application by failing to give adequate weight to positive equities. The BIA affirmed the order of the IJ and dismissed the appeal. Douglas then appealed to the United States Court of Appeals for the Second Circuit, arguing that the BIA had erred because it failed to consider the economic impact of his deportation on his family, failed to consider "meaningfully" the emotional impact of the deportation upon Douglas, and failed to conclude that the positive equities it did consider were unusual or outstanding. 28 F.3d at 243. The Court of Appeals rejected his claims, in part because "Douglas [had] not demonstrated that the BIA has uniformly considered characteristics such as his to be 'unusual or outstanding.'" *Id.* at 245. The court noted that, "[w]hether such equities should be considered unusual or outstanding depends upon the specific facts of each case viewing the record in its entirety." *Id.*

At issue in *Douglas* was the consideration of unpublished BIA cases. Douglas cited three unpublished opinions of the BIA for the proposition that long-time United States residence, family ties, and emotional and economic hardship to a relative constituted "unusual or outstanding" circumstances meriting weight in the consideration of the section 212(c) application

of a convicted narcotics offender. *See id.* at 244. The INS countered that the three unpublished opinions of the BIA cited by Douglas could not be relied upon as precedent. *See id.* at 245. Douglas then observed that the Court of Appeals for the Second Circuit had itself relied upon unpublished BIA opinions in *Vargas v. INS,* 938 F.2d 358, 362 (2d Cir.1991), in concluding that the BIA's departure from precedent in that case was arbitrary and capricious. The Court of Appeals in *Douglas* clarified that "such decisions should not be relied upon as binding precedent in unrelated matters." *Douglas,* 28 F.3d at 245.

In *Lovell v. INS,* 52 F.3d 458 (2d Cir. 1995), the Court of Appeals held that an immigration judge abused his discretion by not granting a change of venue, but that there was no prejudice, since it did not affect the outcome of the Section 212(c) determination. The petitioner's criminal record in *Lovell* included two narcotics convictions. The BIA had noted that the petitioner's criminal history was a serious adverse factor weighing heavily against him in the discretionary balancing of factors required by section 212(c). At his deportation hearing, the Court of Appeals observed that the IJ had established "that petitioner came here when he was thirty and had been here but four years when his criminal problems began," and that they culminated "in two separate drug convictions, state and federal, one for conduct while on bond from the other." *Id.* at 460. As a result of the two narcotics convictions, the Court of Appeals determined that it was incumbent on the petitioner to show unusual or outstanding countervailing equities to obtain a waiver of deportation. *See Lovell,* 52 F.3d at 461. The Court of Appeals concluded that both the immigration judge and the BIA gave full credit to the petitioner's positive factors, including a history of employment, though marred by the failure to pay taxes, strong

family ties to the United States, and some evidence of good character. It concluded that these findings were insufficient to outweigh the adverse factors presented by his two narcotics convictions, and as a result, the court declined to disturb the decisions of the IJ and the BIA.

In *Zaluski v. INS,* 37 F.3d 72 (2d Cir. 1994), a non-citizen petitioned for review of a final order of deportation by the BIA. Zaluski contended that the BIA abused its discretion in dismissing his appeal. The Court of Appeals reviewed the reasoning of the BIA:

> After finding that some of Zaluski's equitable arguments were more appealing than the IJ had found them to be, the BIA nevertheless held that Zaluski's "repeated criminal violations constitute a serious adverse discretionary factor," and that, "[w]hile his equities, including lengthy residence, hardship to himself and to his family, and employment ties to the United States rise to the level of outstanding and unusual, ... they are insufficient to outweigh the seriousness of his criminal activity."

*Id.* at 74. The Court of Appeals reiterated that it would only find an abuse of discretion where the decision was made without a reasonable explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group. *See id.* It stated that "[b]ecause we must give considerable deference to INS decisions, we need only decide whether or not the INS considered the appropriate factors and came to a decision that has any rational basis." *Id.* (citing *Dhine v. Slattery,* 3 F.3d 613, 619 (2d Cir.1993)). The Court of Appeals ultimately concluded that "the BIA fully considered all of Zaluski's arguments, carefully weighed all the equities of the case,"

and as a result, "[found] no abuse of discretion in this case." *Id.*

In *Arango–Aradondo v. INS,* 13 F.3d 610 (2d Cir.1994), the Court of Appeals held that a denial of a waiver of deportability did not constitute an abuse of discretion. The deportation in *Arango–Aradondo* was prompted by a 1990 plea of guilty to attempted criminal sale of a controlled substance in the third degree, which resulted in a sentence of three to six years imprisonment. *See id.* at 610. Viewed in its entirety, Arango–Aradondo's criminal record included, *inter alia,* "twenty-one arrests, seven convictions and multiple extended periods of incarceration." *Id.* at 611–612. The Court of Appeals declined to disturb the determination of the IJ and the BIA's affirmance of that decision:

> In this case, it is evident that the immigration judge carefully and thoroughly weighed the evidence in Arango's favor (including his drug and alcohol rehabilitation efforts, his longtime residency in the United States, his close family ties, and the hardship he will endure in Colombia given his HIV status and his lack of ties there) against the detrimental evidence (including his sporadic employment record, his failure to file taxes, and, most importantly, his "very lengthy and very severe" criminal record together with his long involvement in drug culture). Based on these considerations, the judge concluded that "the positive factors presented just do not outweigh the adverse factors." Since the judge considered the evidence presented by Arango, we are not empowered to reweigh the evidence and second guess his determination.

*Id.* at 613.

In *Rabiu v. INS,* 41 F.3d 879 (2d Cir. 1994), the Court of Appeals held that the failure of a non-citizen's lawyer to timely file an application for a section 212(c) waiver of deportation constituted ineffective assistance of counsel. Before it could find that the attorney's failure to file caused the defendant actual prejudice, the district court indicated that the defendant was required to "make a prima facie showing that he would have been eligible for the relief and that he could have made a strong showing in support of his application." *Id.* at 882. It decided:

> Rabiu made a *prima facie* showing that he was eligible for relief under section 212(c) in his brief to the BIA. He alleged that he arrived in the United States when he was nine years old and that he has resided continuously in the United States for the past fifteen years as a lawful permanent resident, well over the statutory minimum of seven years. He alleged that his father, sisters and cousins all reside in the United States, giving him substantial family ties to the United States. He also alleged that he has a long history of employment, and that he has made efforts to rehabilitate himself while in prison by obtaining an associate degree certificate.

> .   .   .   .   .

> Rabiu ... would have been eligible for relief had his section 212(c) application been filed, and ... he was a strong candidate for that relief.

*Id.* at 883 (citation omitted). The Court of Appeals came to this conclusion despite the fact that the defendant "was convicted of an aggravated felony and sentenced to five years' imprisonment." *Id.* It reversed the BIA's denial of Mr. Rabiu's appeal and remanded to the IJ to allow him to file for a waiver of inadmissibility pursuant to section 212(c).

In *Vlassis v. INS,* 963 F.2d 547 (2d Cir.1992), a non-citizen petitioned for review of an order of the BIA denying his application for a stay of deportation. The

Court of Appeals held that the resident who was subject to deportation for violating narcotics laws was not entitled to a discretionary waiver of deportation. The court considered that in December of 1981, Vlassis pled guilty to a charge of unlawful possession of cocaine, quaaludes, and marijuana, and was conditionally discharged. In May of 1985, he was convicted upon a plea of guilty to a charge of attempted criminal sale of marijuana and was fined $100. Less than six months later, in November of 1985, he pled guilty to a charge of criminal sale of marijuana and was fined $200. In April of 1986, he was named in a sixteen-count indictment charging various narcotics violations. In July of 1986, he pled guilty to one count alleging criminal sale of cocaine in the third degree and was sentenced to a one to three year prison term. The Court of Appeals in *Vlassis* reasoned:

> At the outset, Vlassis appeared to be a likely candidate for waiver. Born in Greece in 1960, he came to the United States with his parents in 1967 and has resided in this Country ever since. He speaks little Greek and has only one known relative in Greece. However, these equities quickly were outweighed by adverse factors.

*Id.* at 550. With the exception of the identified equities, the court found that Vlassis presented a relatively weak case for discretionary relief:

> His employment record was suspect, his claim being that he worked mainly for members of his family and often was paid "off the books." He claimed to have received a high school equivalency diploma during his incarceration and to have received substance abuse counselling. However, no family members testified on his behalf, and he submitted no documentary evidence in support of his claim of rehabilitation. Accordingly, he

was granted a continuance to produce both witnesses and supporting documents. [The IJ] wanted to see an up-to-date parole officer's report, a report showing Vlassis' attendance at drug counselling sessions, tax returns for the years Vlassis claimed to have been working, a certificate of dismissal from parole and an up-to-date police record. [The IJ] adjourned the hearing so that this evidence could be produced.

> At the next hearing ... Vlassis produced none of the requested documents or witnesses, and the matter was adjourned again .... At the [next] hearing, the requested documentary evidence still was not produced. Vlassis' mother did appear and testify. Her testimony did little to bolster her son's case, as it did not appear that she and her son were very close. She did not know that he had a drug problem or that he had been arrested three times prior to his 1986 conviction.

> Not surprisingly, [the IJ] concluded that Vlassis had not established that he had rehabilitated himself from his drug-related problems so that the social and humane considerations in his favor were not outweighed by the undesirability of permitting him to remain a permanent resident.

> In an eight-page order which recited at length the facts and findings below, the BIA ... dismissed Vlassis' appeal ... demonstrating thereby a complete knowledge of the facts and the applicable law. Its reasoning followed very closely that of [the IJ] and is persuasive.

*Id.*

In *Vargas v. INS,* 938 F.2d 358 (2d Cir.1991), a non-citizen appealed the BIA's dismissal of his motion to reopen the denial of a waiver of deportation. The IJ had found the petitioner eligible for relief under section 212(c), and had acknowledged

that he had strong family ties in the United States. She denied discretionary relief, however, based on his criminal record and a weak showing of rehabilitation. The petitioner appealed from the IJ's decision to the BIA, which then dismissed his appeal. While the BIA acknowledged that the "petitioner presented 'outstanding equities,' including strong family ties in the United States and no possibility of livelihood in the Dominican Republic," *id.* at 360, it nevertheless denied relief based on his criminal record and slim evidence of rehabilitation. Some time later, petitioner moved to reopen the BIA's denial of relief under section 212(c), and sought "to present new evidence concerning, among other things, his employment history, continued law-abiding conduct, independence from drugs, and family life, including the birth of a child." *Id.* The Court of Appeals held that the decision of the BIA denying the motion to reopen the denial of the waiver of deportation, based on a prior BIA decision, was not the product of reasoned decision-making, and vacated the BIA decision. In so doing, it relied on two unpublished decisions of the BIA to find that the decision in petitioner's case was arbitrary and capricious. *See id.* at 362. This approach arguably was later disapproved in *Douglas,* discussed *supra.*

### 2. District Court Cases

In *United States v. Garcia–Jurado,* 281 F.Supp.2d 498 (E.D.N.Y.2003), a noncitizen moved to dismiss a count of illegally reentering the United States after deportation for an aggravated felony. He argued that his deportation was unlawful because he was improperly denied an opportunity to seek discretionary relief under section 212(c). The court agreed, finding actual prejudice based on the conclusion that the deprivation of judicial review may well have resulted in a deportation that would not otherwise have occurred:

Garcia–Jurado claims that he would have been a good candidate for a § 212(c) waiver of deportation. Indeed, he would. Garcia–Jurado has lived here since he was a teenager. He has strong family ties in this country: a mother, stepfather and two half-sisters who are United States citizens. He also has two other siblings who are legal permanent residents, and, importantly, a daughter who is a citizen. He attended high school here, [and] was employed for a year prior to his arrest. He also received a GED and vocational training in prison, and was employed as a machine operator after his release from prison up to the time he was deported. Garcia–Jurado has also submitted an affidavit by [his attorney], who represented him throughout the deportation process, claiming that in his experience representing over 75 aliens at § 212(c) hearings, aliens with equities similar to Garcia–Jurado were reasonably likely to receive § 212(c) relief.

As to adverse factors, other than the conviction itself, the government has not argued that any of the adverse factors weighed against Garcia–Jurado. Moreover, as the Supreme Court noted in *St. Cyr,* 51.5% of the [section 212(c) ] applications for which a final decision was reached between 1989 and 1995 were granted. Nothing in the record indicates that Garcia–Jurado's circumstances were such that would place him outside this statistical norm.

Garcia–Jurado has, therefore, shown that he was prejudiced by the deprivation of judicial review given that it was reasonably likely, and certainly plausible, that he would have received § 212(c) relief. Accordingly, Garcia–Jurado has shown that in addition to being deprived

of an opportunity for judicial review, his deportation was fundamentally unfair. *Id.* at 515 (internal quotation omitted).

In *United States v. Frias–Gomez,* 262 F.Supp.2d 11 (E.D.N.Y.2003), a non-citizen moved to dismiss a charge of attempted illegal re-entry. The district court held that the defendant's prior deportation proceedings violated his due process rights by improperly denying him the opportunity to apply for discretionary relief from deportation. The reasoning for this prejudice determination was as follows:

> Mr. Frias–Gomez can make a plausible showing that these errors prejudiced him. He was statutorily eligible for a waiver of deportation under former section 212(c). He was a lawful permanent resident, had lived in the United States for more than double the seven consecutive years required, and served a term of imprisonment of less than five years.

> If Mr. Frias–Gomez had been granted a section 212(c) hearing, there is a strong possibility that he would not have been deported. He had strong ties to the United States. He entered the United States as a lawful permanent resident at the age of 11 and lived in the United States until his deportation, a period of more than fifteen years. His large family, with whom he is close, has also lived in the United States for an extended period of time. He apparently has no family or close friends in the Dominican Republic. He has a thirteen year old citizen daughter in the United States with whom he would like to build a relationship. Before his conviction, he was steadily employed and a contributing member of the community. Although the crime for which he was deported [possession of a controlled substance with intent to distribute in the third degree] is a serious one, it is not heinous and is essentially his only

criminal history, arguably constituting an aberration for immigration purposes. *Id.* at 16–17.

3. Board of Immigration Appeals

a. Precedential Cases

The BIA would hear appeals from immigration judge decisions granting or denying section 212(c) relief. Its review of such decisions was *de novo.*

> The Board of Immigration Appeals has ... been questioned concerning the standard of review we utilize when considering a discretionary decision of the immigration judge, such as the section 212(c) application in the instant case. Specifically, we have been questioned about the relationship between the Board and the immigration judge in terms of discretionary authority.

> We state at the outset that when the Board engages in a review of a discretionary determination by an immigration judge, we rely upon our own independent judgment in deciding the ultimate disposition of the case.... The authority of the Board to issue a discretionary decision independent from that of the immigration judge has been recognized by the federal courts. Thus, we do not employ an abuse of discretion standard when reviewing discretionary determinations of immigration judges.

> The advantage of an independent standard of review is that it promotes uniformity in the application of various discretionary provisions .... If our review were limited to questioning whether an immigration judge abused his or her discretion, we would be unable to remedy [disparities caused by differing decisions on virtually identical facts]. However, by utilizing our own discretionary authority, there exists a forum

available to promote uniformity of result.

.　.　.　.　.

Finally, we acknowledge that questions concerning our standard of review were invited by occasional decisions of the Board which concluded that the immigration judge "did not abuse his discretion." We agree that the use of this and similar language can be misleading. However, such language is attributable to inartful drafting rather than to a limited review of the record on the part of the Board....

*Matter of Burbano*, 20 I. & N. Dec. 872, 873–74 (BIA 1994). *See also* Jeffrey L. Romig, *Administrative Review of Cases Involving the Exercise of Discretion Under Section 212(c): Should the Board of Immigration Appeals Adopt an "Abuse of Discretion" Standard?*, 9 GEO. IMMIGR. L.J. 63 (1995) ("The BIA's practice of applying a *de novo* standard of review in exclusion and deportation cases has its origin in a decision issued forty years ago.... The BIA's observation in 1969 that it has 'plenary power to make a *de novo* review of the record and based on such a review make its own independent findings on questions of fact and law irrespective of those made by the special inquiry officer,' stands today as a succinct statement of the review authority which the BIA may exercise in exclusion and deportation cases.") (citing *In re Vilanova–Gonzalez*, 13 I. & N. Dec. 399, 402 (BIA 1969)).

The BIA would exercise its independent review authority to re-weigh the positive and adverse factors that were considered by the immigration judge in the first instance. Instructive decisions whose fact patterns may not closely mirror the facts of the instant case also bear consideration. They will be treated in chronological order.

*Matter of Marin,* discussed above, set forth the balancing test of positive and adverse factors to be employed in section 212(c) determinations. 16 I. & N. Dec. 581 (BIA 1978). The applicant was a 46–year-old Colombian citizen who pled guilty to the felony of criminal sale of cocaine. The immigration judge concluded that the respondent had failed to establish that a waiver of deportability was merited as a matter of discretion. He determined that given the criminal conduct at issue, a narcotics conviction, a waiver should not be granted absent a showing of "unusual or outstanding equities." *Id.* at 583.

Other than his residence in the United States for 12 years, however, the respondent was "unable to advance any substantial equities." He was single, childless, and had no relatives residing in this country. His closest relatives (a brother and sister) both lived in Colombia. The respondent's employment history was sporadic and he presented no evidence that he would have particular difficulty returning to Colombia other than stating that "life [was] too hard there."

*Id.* at 583. Based on the record as a whole, the immigration judge concluded that the respondent's conviction as a drug offender had not been sufficiently offset by his twelve years of residence in the United States and his adjustment to prison life so as to warrant the granting of discretionary relief. *See id.* The BIA affirmed, stating that,

[t]he Board has not adopted an inflexible test for an immigration judge to use to determine as a conclusory matter whether section 212(c) relief should be granted as a matter of discretion. The undesirability and "difficulty, if not impossibility, of defining any standard in discretionary matters of this character which may be applied in a stereotyped manner" has

long been recognized. Instead, it has been held that each case must be judged on its own merits.

16 I. & N. Dec. at 584 (citation omitted).

*Matter of Buscemi,* 19 I. & N. Dec. 628 (BIA 1988) involved an application for section 212(c) relief. The non-citizen was a single, 26–year–old native of Italy whose crime was the attempted criminal sale of the controlled substance heroin. The applicant had resided in the United States since 1970, his entire immediate family resided in the United States, he had helped to support his family, and he had served as a father figure to his four siblings since they were abandoned by their biological father in 1975. The respondent submitted copies of letters and affidavits from his former neighbors and employer testifying to his good character. The IJ denied the application for section 212(c) relief, concluding that the respondent had not demonstrated the outstanding equities and genuine rehabilitation necessary to merit relief in the face of a serious criminal record. The BIA concluded:

> Even considering the outstanding equities which the respondent has been able to establish, we do not find that granting relief is warranted or in the best interests of this country. In reaching this conclusion, we have evaluated the respondent's equities against the serious adverse factors present in his case and our determination that he has not demonstrated rehabilitation. While his deportation may well involve hardship to himself and certainly much unhappiness for his family, the responsibility for this result rests with the respondent alone.

*Id.* at 635–36.

*Matter of Edwards,* 20 I. & N. Dec. 191 (BIA 1990), involved a 44–year–old native and citizen of Barbados, who had been admitted to the United States twenty-two years earlier. He had married a United States citizen and had four citizen children. His criminal record included: attempted burglary (1977); third degree burglary, larceny, possession of burglary tools, and possession of stolen property (1979); attempted burglary (1981); possession of a controlled substance (1985); and two counts of possession with intent to distribute a controlled substance, three counts of intentional distribution of a controlled substance, and a single count of conspiracy to distribute a controlled substance (1987). Edwards pleaded that his wife and children, as well as his mother and siblings, resided in the United States and that he knew no one in Barbados. His employment history was presented as a positive factor, although he acknowledged that he was unemployed during the period leading up to his 1987 convictions, and that he had sold drugs while his wife was supporting him. Finally, he explained that his wife would be unable to accompany him to Barbados because the country lacked special education facilities for his autistic son.

The immigration judge denied relief, reasoning that the serious negative factor of the respondent's criminal convictions could only be overcome by a showing of unusual or outstanding equities, together with a demonstration of rehabilitation. The BIA clarified its position with respect to a requirement of rehabilitation:

> With respect to the issue of rehabilitation, the Board noted in *Matter of Marin* . . . and reiterated in *Matter of Buscemi* . . . that a section 212(c) waiver applicant who has a criminal record "ordinarily" will be required to make a showing of rehabilitation before relief will be granted as a matter of discretion. This language has been interpreted in some cases as though a clear showing of reformation is an absolute prerequisite to a favorable exercise of discretion in every case involving an alien with a

criminal record. To the extent that this language may be read as creating an absolute prerequisite to a favorable exercise of discretion, we withdraw from it. Rather, 212(c) applications involving convicted aliens must be evaluated on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion.

*Matter of Edwards,* 20 I. & N. Dec. at 196. While it made clear that rehabilitation is not a threshold requirement for non-citizens with criminal convictions, the BIA did take rehabilitation into account as a factor in reaching its ultimate conclusion with respect to the applicant in *Matter of Edwards:*

> In balancing the various factors of the respondent's case, we take note of his favorable equities, which we found to be unusual or outstanding. However, when we weigh these equities against the adverse factors of his extensive criminal record, which includes controlled substance distribution offenses, and our lack of confidence as to his rehabilitation, we determine that a favorable exercise of discretion is not warranted.

*Id.* at 198–99.

In *Matter of Roberts,* 20 I. & N. Dec. 294 (BIA 1991), the BIA, conducting a *de novo* review, overturned an immigration judge's grant of section 212(c) relief. The IJ had determined that relief was warranted in the exercise of discretion. He reasoned that the serious negative factor of a criminal conviction for the sale of a controlled substance, cocaine, had been overcome by the respondent's period of residence in this country, his family ties, the hardship that deportation would impose on his family, his clean criminal record prior to and after his conviction, and his history of employment. The IJ also reasoned that a single conviction for the sale of cocaine did not constitute drug trafficking and that

some of the facts presented raised the possibility of entrapment.

The BIA rejected the immigration judge's conclusion, first deciding that a single conviction for the sale of narcotics sufficiently established trafficking. As to the question of entrapment, the BIA observed that "[w]hile inquiry may be had into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted, it is impermissible to go behind a record of conviction to reassess an alien's guilt or innocence." *Id.* at 301. In weighing the positive and adverse factors considered by the IJ *de novo,* the BIA reasoned:

> We find that the respondent's conviction for sale of cocaine constitutes an extremely serious adverse factor. As such, the respondent must demonstrate unusual or outstanding equities if he is to have the possibility of receiving a favorable exercise of discretion on his waiver application. We conclude that the respondent has not demonstrated unusual or outstanding equities so as to offset the serious adverse factors in his record.

> In the respondent's favor, we take into account the fact that he has resided in the United States for approximately 12 years. However, we do not find that this period is so lengthy as to constitute an unusual or outstanding equity, particularly where the respondent was an adult when he was first admitted to this country as a lawful permanent resident. The majority of the respondent's family reside[s] in New York, and although none of them appeared to testify on his behalf, they did submit letters in support of his waiver request. We note that although the respondent has many close relatives residing lawfully in the United States, he has been separated

from his wife and their four children since 1987. Further, he admitted that he did not call or write to his wife since he was convicted in 1989. In addition, the respondent testified that he is not sure of the whereabouts of his 2–year-old son but believes that he is in the custody of the child's maternal grandmother, who supports him from her welfare income. In terms of the financial difficulties that his family may face due to his deportation, we note that none of the respondent's family appear to rely on him for financial support. The respondent admitted that between 1987 and 1989, he provided only occasional support of a minimal amount, and that since 1989, he has provided no support at all. In addition, his testimony regarding his 2–year–old son indicates that he does not provide any support for him. Therefore, the respondent has not shown that his family's financial situation will be materially altered if he is forced to depart from this country.

We do not consider the respondent's employment history to be an unusual or outstanding equity. The irregularity of his employment between 1987 and 1989 certainly impairs the significance of this factor. The respondent admits he has paid no income taxes since 1986. Additionally, he did not demonstrate that he has any business or property ties to this country. The respondent merely asserts that he would not be able to afford tools or real estate in Jamaica. Aside from this statement, he did not present any evidence that he would have difficulty residing in Jamaica. In fact, the respondent testified that he may have relatives living there, including his father and his aunt.

On the other hand, the respondent was convicted of [the] sale of cocaine, an aggravated felony . . . .

After balancing the respondent's equities, which we do not find to be unusual or outstanding, against the adverse nature of his serious criminal conviction for the sale of a controlled substance, and our lack of confidence as to his rehabilitation, we conclude that he has not demonstrated that he warrants a favorable exercise of discretion.

*Id.* at 302–303.

In *Matter of Coelho,* 20 I. & N. Dec. 464 (BIA 1992), the BIA entertained an appeal by a non-citizen who had been denied section 212(c) relief. Coelho had been convicted of conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine. The BIA considered the particular facts of his case, weighing the relevant factors:

We find that the respondent's convictions . . . compel the respondent to show unusual or outstanding equities to warrant a grant of relief.

In the respondent's favor, we consider most significant his familial ties in the United States and his more than 23 years of residence in this country, beginning when he was only 13 years old. The respondent is the father of two United States citizen children, who at the time of the deportation hearing were 5 and 7 years of age. At the time of his deportation hearing, both children were living with the respondent's former spouse. The record reflects that both the respondent and his former spouse have joint custody over the children, and the respondent is not required to pay any support. The respondent testified that he nevertheless sends them between $75 and $300 per week depending on whether he has gone out fishing.

A majority of the respondent's other family members reside in the United States. The respondent testified that at the time of his deportation proceedings,

six of his siblings were living in the United States, while two were in Canada and only one was in Portugal. He stated that his father was deceased and that his mother, with whom he was ... living, was in the United States. The record reflects that the respondent and his mother reside[d] in a three-family dwelling, the respondent's mother was 74 years old and was primarily supported by the respondent. The respondent has sustained intermittent employment since the age of 16 with the fishing industry.

We find that the respondent's more than 23 years in the United States, beginning at age 13, and his familial circumstances are sufficient to show unusual or outstanding equities. Given the fact that most of his family is in the country, that he has two United States [citizen] children that he supports, and that he currently resides with and supports his mother, the respondent's equities, taken as a whole, rise to the level of unusual or outstanding. Our analysis, however, does not end here. The fact that an alien demonstrates the requisite unusual or outstanding equities does not mandate that discretion be exercised in his favor; rather, we must weigh the equities against the adverse factors.

In regard to the adverse factors in the case, we note the seriousness of the respondent's conviction for his two offenses. Both offenses involved cocaine possession with the intent to distribute.... [T]he respondent was sentenced to confinement for 3 years, given a special parole term of 3 years, and ordered to pay $150. By the respondent's own admission, he intended to sell 2 pounds of cocaine when he was arrested. The respondent planned to reap and share in the $50,000 from the illicit drug transaction.

We agree with the immigration judge's conclusion that even though the respondent denied any involvement in distributing large amounts of cocaine, the record reflects that he had been involved in cocaine trafficking for an extended period of time. The respondent testified that he first became involved with cocaine distribution when he was 25 or 26 years old, which would mean that he participated in the distribution of cocaine from 1980 or 1981 until his conviction in 1986. The respondent also admitted that he used cocaine himself during this period of time. We find that this testimony and the fact that 2 pounds of cocaine were found on the respondent contradict his statement that he was not involved in the distribution of large quantities of drugs. Furthermore, we find that the respondent's testimony regarding his involvement was very evasive.

.     .     .     .     .

The respondent attempted to show that he had completed his rehabilitation. He testified that he had no other convictions, that he pleaded guilty to his offenses, and that he had complied with all the terms of his probation. Notwithstanding his testimony, we conclude that the respondent has not established rehabilitation. During his testimony at the deportation hearing, the respondent was unwilling to give straightforward answers in response to the Service's questioning. The respondent did not express any remorse and was unwilling to provide details regarding his cocaine transactions. For these reasons, we conclude that he did not prove rehabilitation.

After evaluating the facts of this case, we find that a grant of relief is not warranted or in the best interests of this country. In reaching this conclusion, we have considered the respondent's outstanding equities and the serious ad-

verse factors presented in this case, as well as our determination that he has not demonstrated either rehabilitation or other factors to merit a favorable exercise of discretion. While the respondent's deportation may well involve hardship to himself and certainly much unhappiness for his family, the responsibility for this result rests with the respondent alone....

*Id.* at 468–70. The BIA denied the appeal from the IJ's decision.

*In re Catalina Arreguin de Rodriguez,* 21 I. & N. Dec. 38 (BIA 1995), involved an appeal from a denial of section 212(c) relief by an immigration judge. The applicant was 41 years old and a native citizen of Mexico. She moved to the United States in 1970, when she was 17 years old, and she was formally admitted as an immigrant on December 12, 1975. On September 29, 1993, nearly twenty years later, the applicant was convicted of importation of a controlled substance, a conviction involving 78.45 kilograms of marijuana. The immigration judge denied relief under section 212(c). The BIA reversed. It found that the applicant's rehabilitation, including immediate acceptance of responsibility, was an equitable factor in her favor. It also found the following:

> Despite her current incarceration, the record reflects that the applicant has apparently used her time in prison well in that she has advanced her otherwise meager education by voluntarily pursuing GED studies, for which she received a letter of commendation, has pursued other courses, has had no prison infractions, and has been involved in a church ministry.... The other two major equities to be considered in the applicant's favor are her long residence and her five United States citizen children.... The letters of support submitted by the applicant assert that she is a responsible

and caring mother and that her exclusion and deportation would bring great hardship upon the children. Accordingly, we find that the minor children do constitute an outstanding equity, and that the three adult children are family ties to the United States to be considered in her favor.

> Likewise, we find that the applicant's nearly 20 years of lawful permanent residence in this country constitutes an unusual or outstanding equity. The immigration judge found this not to be so because she "has little to show for her residence in the United States." There is no doubt that additional community ties, property and business holdings, or special service to the community would be equities in her favor. However, the absence of those additional ties in [itself] does not negate the weight to be accorded the applicant's long residence in this country, which is otherwise without a criminal record, and during most of which she has been employed. We note that the applicant testified that she has paid income taxes and she submitted copies of returns from 1982 to 1986. Accordingly, we consider the applicant's long residence to be an unusual and outstanding equity in her favor.... [W]e consider the applicant's long history of employment to be a favorable equity.

> In sum, upon consideration of the applicant's efforts at rehabilitation and the other factors outlined above, we give greater weight to the favorable facts of record than did the immigration judge.

*Id.* at 40–42. While the BIA explained that a non-citizen who has committed a serious drug offense faces a difficult task in establishing that he or she merits discretionary relief, *see id.* at 42–43, it underscored that even when presented with serious crimes, "relief under 212(c) may be

merited based upon the totality of circumstances presented in a particular case." *Id.* at 43. It granted a section 212(c) waiver of inadmissibility.

b. Unpublished Cases

The Court of Appeals charged the court with the following duty:

The court must first obtain all of the facts relevant to the particular alien and then apply standards established under Section 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief.

*Copeland,* 376 F.3d at 74. The request to take into account actual cases in the context of decisions by immigration judges and the Board of Immigration Appeals poses a substantial challenge. The majority of decisions that might shed light on what actual immigration judges did when confronted with similar fact patterns, are largely unavailable—unless a party seeks them through discovery. Oftentimes, the closest a court can come to identifying what sorts of decisions immigration judges made when faced with particular facts is by looking to those decisions appealed. The BIA, however, reviewed "only a small percentage of the total number of cases heard by immigration judges [who were] also vested with the discretion to grant relief." *Matter of Burbano,* 20 I. & N. Dec. 872, 878 (BIA 1994). This presents a skewed sample because non-citizens satisfied with the results of an immigration judge's decision, in cases where the government did not seriously object, were never appealed.

Not only are virtually all section 212(c) immigration judge decisions unpublished and inaccessible, but the BIA identified for publication only a select set of section 212(c) decisions that would bind immigration judges. *See* 8 C.F.R. § 3.1(g). Unpublished decisions were afforded no prec-edential value. *See, e.g., Douglas v. INS,* 28 F.3d 241, 245 (2d Cir.1994) (holding that unpublished decisions should not be relied upon as binding precedent in unrelated matters).

When consideration of actual cases is limited to published opinions, such as some of the landmark BIA cases cited above, the misleading appearance may be created that section 212(c) relief was usually denied in cases involving serious criminal conduct, particularly drug cases.

The Court recognizes that the BIA hears only a small percentage of the total number of cases heard by immigration judges and that the immigration judges are also vested with discretion to grant relief. Yet this does not diminish the fact that, in cases which do eventually reach the BIA, the BIA's lack of the exercise of discretion leaves the impression that it has a policy of not granting a 212(c) waiver in a case where an alien has been convicted of a serious drug offense....

Courts and administrative agencies are given discretionary power in order to individualize the application of law, make it flexible and adaptable to circumstances. Without it, the law is apt to be criticized as harsh, unfeeling and unjust. In deportation cases, the Attorney General or her designees, in this case the INS and the BIA, are entrusted with the authority to exercise discretion in order to ameliorate the harsh results that deportation wrecks on aliens and their families by allowing, in certain circumstances, a waiver of deportation....

*Gonzalez v. INS,* 996 F.2d 804, 810–11 (6th Cir.1993). *But see Matter of Burbano,* 20 I. & N. Dec. 872, 879 (BIA 1994) ("In sum, this Board has never implemented, in law or in fact, a strict policy of denying section 212(c) relief to every alien convicted of a

serious drug offense without regard to the totality of circumstances presented in the case. Our established practice has been, and continues to be, to premise discretionary determinations on the individual factors presented in a given case.").

Though landmark published BIA decisions would appear to suggest that relief was almost always denied, either at the IJ level or upon reaching the BIA, it is beyond dispute that over half of all section 212(c) applications were granted. In fact because BIA review of section 212(c) determinations was *de novo*, a non-citizen denied relief by the IJ had a reasonable second chance on appeal, and it was not uncommon to grant relief where an IJ had not, although reversals were largely unpublished.

[A] factor which complicate[d] the BIA's ability to issue uniform decisions in this area [was] the fact-specific nature of the discretionary section 212(c) inquiry. Each section 212(c) case [was] unique, involving a myriad of discretionary factors. There ... often [may have been cases] with similar fact patterns— such as an alien in his twenties who ha[d] resided here for half his life, ha[d] a sporadic employment record, ha[d] family ties in this country, and ha[d] a serious drug conviction. But the dispositive factors in these similar kinds of cases [would have been] whether, for example, the particular alien ha[d] demonstrated that his family [was] reliant upon him for emotional and financial support, or [whether] the particular alien ha[d] made a persuasive showing of reformation.

Jeffrey L. Romig, *Administrative Review of Cases Involving the Exercise of Discretion Under Section 212(c): Should the Board of Immigration Appeals Adopt an "Abuse of Discretion" Standard?*, 9 GEO. IMMIGR. L.J. 63, 72 (1995). *See also* Daniel Kanstroom, *Surrounding the Hole in the Doughnut: Discretion and Deference in U.S. Immigration Law,* 71 TUL. L. REV. 703, 802 (1997) (discussing the crisis of discretion posed by "excessive and inconsistent use of adjudicatory rulemaking by the Board of Immigration Appeals ....").

The difficulty is this: A court, tasked with determining whether an individual was prejudiced by a fundamental error in his deportation, must determine whether it is likely that the individual "would have been granted Section 212(c) relief if he had obtained a hearing." *Copeland,* 376 F.3d at 73. It suggests a quasi-empirical analysis, *i.e.,* an inquiry into what actually would have happened. Yet courts are effectively prevented, by lack of publication, from considering IJ decisions—the vast majority of "actual cases"—and the only effective window into what actually did happen. All that is firmly known is that at the time of the Supreme Court's decision in *St. Cyr,* "over half of all Section 212(c) applications had been granted." *Id.* at 74. The details of the underlying grants and denials are not readily accessible, and even when accessible, not formally available for courts' consideration. In all but the most obvious cases—from terrible crimes with no equities, to minor crimes with great equities— the answer to the question of what would have happened at a section 212(c) hearing can rarely amount to more than speculation.

In an effort to comply with the request of the Court of Appeals to consider actual cases with similar facts, apart from the select group of published BIA decisions whose facts have some similarity to the defendant's, the court examined unpublished materials of the BIA, available on electronic databases, not for consideration as precedent, but to obtain a sense of how immigration judges and the BIA have his-

torically treated applications for section 212(c) relief by aliens with criminal records that were "quite serious." *Copeland,* 376 F.3d at 74. The review confirms what the broader *St. Cyr* statistic suggested, namely, that immigration judges and the BIA have granted relief in many cases involving serious criminal histories, and denied relief in many others. Cases involving serious criminal conduct have often been deemed "close" by the IJ, the BIA, or both, suggesting that their resolutions were by no means predetermined.

Pre as well as post–1996 cases demonstrate the challenge in applying the prior law in "close cases." *See, e.g., In re Antonio Reyes–Hernandez,* No. A37 202 672, 2004 WL 1398621 (BIA Mar. 15, 2004) ("Although this is a close case given the respondent's rehabilitation, we agree with the Immigration Judge that, on balance, the negative factors do . . . . outweigh the respondent's positive factors. In this respect, we note that the respondent admitted to selling cocaine approximately 500 times during the course of several years . . . ."); *Matter of Jose Feliz,* No. A37 645 946, 29 Immig. Rptr. (MB) B1–1 (BIA Apr. 13, 2004) (granting motion to reconsider IJ decision denying section 212(c) relief, and determining contrary to IJ decision that "the respondent [was] deserving of relief in discretion" in light of positive factors in respondent's favor, such as length of residence, family ties, and medical condition, although recognizing that "admittedly a substantial amount of cocaine was involved [in his offense.]"); *Jose Santos–Maldonado,* No. A93 192 030, 2004 WL 1739060 (BIA June 22, 2004) ("[W]e defer to the Immigration Judge's first hand assessment that the gravity of the respondent's crime [of moral turpitude], which cannot be denied, is outweighed by the respondent's equities."); *In re Souvith*

*Vongvixay,* No. A23 882 967, 2003 WL 23216741 (BIA Sept. 29, 2003) ("The Board recognizes that this is a close case with regard to the exercise of [section 212(c) ] discretion considering the nature of respondent's criminal history (sexual assault in 1st degree; possession of a stolen vehicle; shoplifting). Like the Immigration Judge, however, the Board finds that the respondent' in this case presented outstanding or unusual equities which do outweigh the adverse factors in this case."); *Matter of Dominos Dias Goncalves,* No. A34 744 205, 26 Immig. Rptr. (MB) B1–117 (BIA Nov. 25, 2002) (overturning IJ's denial of 212(c) relief and noting: "[W]hile it is indeed lengthy, the respondent's criminal record includes several arrests for minor offenses which were committed when the respondent was a minor from an abusive and troubled background. Given the strength of the positive factors in this case, including the evidence of the respondent's strong ties in the United States and of his significant rehabilitation, we conclude that the positive factors surpass the cumulative weight of the respondent's criminal record and his substance-abuse history."); *Matter of Maico Grimaldy Lopez–Jimenez,* No. A36 410 813, 25 Immig. Rptr. (MB) B1–125 (BIA Mar. 24, 2002) ("Initially, we find that the respondent's criminal history, most significantly his two convictions for attempted robbery, is . . . very serious. He has two convictions for violent crimes, and it is troubling that the second robbery conviction occurred when he was on probation. We also consider that the respondent had several other arrests related to drug use . . . . It would take an exceptional case to establish equities to overcome these negative factors. In the respondent's case, we find that his strong evidence of rehabilitation ultimately tips the balance of the equities in his favor."); *Matter of Wayne Martin Cammack,* No.

A30 756 066, 26 Immig. Rptr. B1–25 (BIA July 9, 2002) (upholding IJ's grant of 212(c) relief to an aggravated felon who sold crack cocaine, who was never regularly employed in the United States, and who failed to demonstrate that he would have any difficulties in returning to the United Kingdom: "The respondent's equities are considered in light of his serious criminal history and conduct in this country. While this is a very close case, on this record we find that the Immigration Judge was within her range of discretion in determining that the respondent has met his burden of establishing unusual and outstanding countervailing equities which outweigh the adverse factors."); *In re: Refugio Lopez–Armenta de Velarde*, No. A11 440 995, 7 Immig. Rptr. (MB) B1–161 (BIA Sept. 15, 1989) (overturning immigration judge's denial of section 212(c) relief, where noncitizen was convicted of possession of 41 pounds of marijuana with intent to distribute, finding that extremely long residence coupled with lawful presence in the United States of entire family constituted outstanding or unusual equities); *Matter of Andreas Weingarther*, No. A8 610 922, 2 Immig. Rptr. (MB) B1–170 (BIA June 12, 1985) (granting a section 212(c) waiver to a non-citizen convicted of first-degree manslaughter as well as a drug offense, noting: "We agree with the Service that the adverse factors present in this case are substantial and therefore when this case was first before us in 1978, when the application for 212(c) relief was originally submitted, we concluded that the favorable exercise of discretion was unwarranted.... When it comes to the exercise of discretion, reasonable persons may differ and frequently do. In this case, the evidence of rehabilitation is substantial and the equities are outstanding. Consequently, we find no reason at this time to disturb the immigration judge's decision in this admittedly close case."); *Matter of Jose Jesus*

*Gutierrez–Murillo*, No. A13 717 602, 6 Immig. Rptr. (MB) B1–72 (BIA 1988) (holding that respondent's equities outweighed the strong adverse factors of record, including a conviction for selling cocaine and a conviction for voluntary manslaughter, where defendant's victim was his brother, noting that, "when evidence of serious negative factors [is] present, such as serious drug offenses, or where human life has been endangered or, as in this case, has been taken away, a showing of unusual or outstanding countervailing equities will be necessary in order to support a grant of relief under section 212(c) of the Act.").

Of the significant number of "close" cases reviewed, at least two section 212(c) cases ultimately resulted in the grant of relief to individuals whose criminal records included both manslaughter convictions and drug convictions. While these cases may have no precedential value, they are instructive in terms of "tak[ing] into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." *Copeland*, 376 F.3d at 74.

c. Challenge of "Actual Cases"

Despite the suggestion by the Court of Appeals that the district court should consider actual cases of similarly situated individuals, as indicated above, the lack of access to the full picture of how immigration judges and the BIA were actually deciding cases—and their variability over the years—makes it difficult to accurately assess how similar fact patterns would have been handled.

The Court of Appeals nonetheless seeks a retroactive prediction of what *would have happened* at a hearing before a hypothetical immigration judge. This inquiry necessarily suggests the following questions: Who would have held the hearing? Would he or she have been sympathetic to

or hardened against stories like those of the defendant? What would the judge's life experience have been like? How would the judge have evaluated witnesses? Ten years ago, what was the atmosphere like in an administrative court? *Cf.* Maurice A. Roberts, *The Exercise of Administrative Discretion Under the Immigration Laws,* 13 SAN DIEGO L. REV. 144, 165 (1975) ("An intolerant adjudicator could deny relief to aliens whose cultural patterns, political views, moral standards or lifestyles differed from his own. Worse still, a hostile or xenophobic adjudicator could vent his spleen on aliens he personally considered offensive without articulating the actual basis for his decision."); Daniel Kanstroom, *Surrounding the Hole in the Doughnut: Discretion and Deference in U.S. Immigration Law,* 71 TUL. L. REV. 703, 731–32 (1997) ("The dichotomy between questions of 'fact' and those of 'law' appears often in discussions of discretion. Despite its venerability and durability, however, this distinction is much more slippery than it might first appear. Fact-finding, for example, might involve hearing evidence, deciding what is relevant or probative, weighing different aspects of evidence, deciding what evidence is accurate or believable, and drawing certain factual conclusions. It is apparent that most, if not all, of these activities themselves depend to some degree on prior 'legal' (or policy or philosophical) decisions. Which facts should be focused on? What is at issue?").

Maurice Roberts, former chairman of the Board of Immigration Appeals, in explaining the importance of the individual making the decision, observed:

> Regardless of the type of discretion involved, the fact remains that it is exercised by impressionable and fallible human beings at all levels of the administrative hierarchy....

> In the absence of carefully considered and clearly articulated standards, for the exercise of the various types of discretionary powers, the resulting decisions must necessarily vary with the personal attitudes and biases of the individual decision makers. Adjudicators with hard-nosed outlooks are likely to be more conservative in their evidentiary appraisals and in their dispensation of discretionary bounties than their counterparts with more permissive philosophies. It must be recognized as a fact of life that Service officers and Board members are no more immune than other persons to the influences that result in individual bias and predilection. To set up as a standard that a case must be "meritorious" before discretion is favorably exercised on behalf of an eligible applicant is therefore illusory. Too many subjective elements go into the making of such a value judgment.

Maurice A. Roberts, *The Exercise of Administrative Discretion Under the Immigration Laws,* 13 SAN DIEGO L. REV. 144, 147–48 (1975).

Despite the great fact-finding deference usually afforded district judges by the Court of Appeals for the Second Circuit, there is a limit to the capacity of trial judges. All that can be said is that in many cases, perhaps even the majority of cases, when presented with the very same set of facts, some immigration judges would have granted section 212(c) relief and some would have denied it, because it would have been left to each "to determine for himself, on the basis of his own subjective experiences and beliefs, just what factors in an alien's life should be determinative in exercising discretion and how much weight should be accorded each factor." *See id.* at 165. How one hypothetical immigration judge would have decided a case is nearly impossible to determine.

We note in this regard that the individualistic nature of a discretionary determination permits the possibility that differing decisions may be reached based on essentially identical facts, with each decision arguably falling within a reasonable exercise of discretion.

*Matter of Burbano,* 20 I. & N. Dec. 872, 873 (BIA 1994). *See also* Mar. 24, 2005 Hrg. Tr. at 132 (Immigration Judge Williams: "Judges can disagree amongst themselves[:] Judge A would have granted it, Judge B would have denied it. But those are usually judges that fall within a permissible center. I mean, there is no absolute correct answer, but there is the permissible middle.").

Immigration judges are human, subject to varying biases, and within the vast permissible middle in section 212(c) cases, perhaps best represented by *St. Cyr*'s fifty plus percent statistic, it is inevitable that some judges would have approached their evaluations with more sympathy and compassion than others:

> My duties [as an immigration judge] sometimes vary considerably from those of other administrative judges and from civil and criminal court judges. I have cases where there are hours of testimony concerning torture in Algerian prisons. I listen to the testimony of medical personnel who are torture experts. I have people who appear in front of me with no attorney, all-alone, and they do not speak English. Not only that, they speak a rare language where there are no interpreters available in this area, and only one or two in the United States. I have many cases where the respondent has dealt with an "attorney" for many months (and at great cost), only to find out later that the person was a notary public and not an attorney, and could not represent him in court.

> .   .   .   .   .

My 30–year career with the Department of Justice has been exciting and stimulating. Each case I hear is a life story. I have been able to grant refuge to persons who have a genuine fear of persecution. I have been able to unite or re-unite families. On the other hand, in many cases I have had to deal with the frustration of not being able to grant relief to someone because of the precise requirements of the statute, even though on a personal level he appears to be worthy of some immigration benefit.

James P. Vandello, *Perspective of an Immigration Judge,* 80 Denv. U.L. Rev. 770, 770–771, 775 (2003). *See also* Daniel Kanstroom, *Surrounding the Hole in the Doughnut: Discretion and Deference in U.S. Immigration Law,* 71 Tul. L. Rev. 703, 767 (1997) ("Critique of the lack of precise bounds of INS discretion, as well as the often incomprehensible manner in which it is exercised, has dogged the INS for many years."). *Cf. Matter of Burbano,* 20 I. & N. Dec. at 874 ("[W]e recognize that the immigration judge who presides over a case has certain observational advantages due to his or her presence at the exclusion or deportation hearing."). This conclusion of egocentricity of the decision-makers is reflected in the extraordinarily individuated factual determinations of the Court of Appeals, the district courts, and the BIA, excerpted *supra.*

The Court of Appeals for the Second Circuit recently discussed its expectation for courts in this situation:

> [W]hat is at stake in the illegal reentry context is *not* the restoration of the defendant's deprived opportunity to apply for § 212(c) relief. Rather, in the illegal reentry context the defendant is asking the court to dismiss the indictment against him .... As such, the courts *must necessarily play the role of prognosticator, and divine* whether, had

the error not occurred, the defendant would likely have obtained immigration relief.

*Edwards v. INS*, 393 F.3d 299, 311 (2d Cir.2004) (emphasis altered from original). Trial courts are not always well-equipped to prognosticate and divine because such enterprises are effectively counter-factual and speculative. *Cf. United States v. Balon*, 384 F.3d 38 (2d Cir.2004) (holding that certain challenges to conditions of supervised release involving computer monitoring were not ripe for review, "because it is currently impossible to predict the [future] state of computer technology....").

The Court of Appeals for the Second Circuit has proposed a *Strickland* habeas corpus test for prejudice in section 212(c) cases such as the instant one. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A *Strickland* test for prejudice may be manageable in other contexts, although never fail-safe. For instance, in a criminal case, an error by defense counsel might well be "harmless" where a killer was found with a smoking gun and there were multiple eyewitnesses to the crime, because there is a clear independent likelihood of conviction—but not a certainty of guilt. In a section 212(c) case, by contrast, unless the non-citizen had not only a serious, but an extraordinarily serious criminal history, along with a dearth of positive factors, given the broad discretion afforded in such questions, an immigration judge's decision to grant or deny relief may have been close.

Perhaps the best example of this wide range of discretion—especially as it related to close cases or cases involving serious criminal records—is the identification of "unusual or extraordinary" equities. "Unusual or extraordinary" equities often amounted to nothing more than re-characterized positive equities. For instance,

residence of long duration in the United States was normally considered a positive equity. It was also one of the most common examples of an "unusual or extraordinary" equity. *See, e.g., In re Catalina Arreguin De Rodriguez*, 21 I. & N. Dec. 38 (BIA 1995). Yet there were no clear standards for when residence of long duration would be considered merely ordinary and when it would be deemed to rise to the level of extraordinary. It appears to have been in the absolute discretion of the IJ or the BIA to make that determination. Meaningful distinctions are at times difficult to parse, and it is fairly clear that individuals with virtually identical situations were treated differently depending on what judge or panel they faced. *See Matter of Burbano*, 20 I. & N. Dec. at 873. This should not be surprising because application of *Strickland* standards in state conviction-based habeas proceedings will vary depending on the district judge and panel of the Court of Appeals for the Second Circuit.

Given the broad range of discretion that could be exercised in cases with identical facts, there is reason to urge that the *Strickland* prejudice requirement should not be transposed into the immigration arena. Cases should instead turn on the seriousness of the due process denial, rather than on an abstract and somewhat ill-instructed impression of that denial's effect. The determination of whether "the entry of the order was fundamentally unfair," 8 U.S.C. § 1326(d)(3), should be resolved by a categorical rather than an individual approach. *Cf. Restrepo v. McElroy*, 369 F.3d 627 (2d Cir.2004) (suggesting that reliance on the availability section 212(c), somewhat analogous to the prejudice inquiry in this case, could be categorically presumed rather than individually determined); *United States v. Andrade–Partida*, 110 F.Supp.2d 1260, 1272

(N.D.Cal.2000) (holding that "defendant's 1996 deportation was tainted by a due process violation, and that the violation prejudiced defendant by foreclosing his opportunity for judicial review."). Even under such a categorical rule, were the government to demonstrate as a matter of law that the applicant could never have obtained section 212(c) relief, *i.e.* that he fell outside the category, relief would be denied. *See id.* (rejecting government's argument that the defendant was not eligible for section 212(c) relief and noting that "defendant's familial and cultural connections in the United States indicate that he may have merited [a] section 212(c) waiver in 1996" because he "had lived in the United States since his childhood, and, at the time of his deportation, he provided support and child care for his United States citizen wife and their three minor children.").

A rebuttable categorical presumption of prejudice is not the standard laid down in the order of remand of the instant case. The defendant's individual case for prejudice therefore is considered in accordance with the mandate of the United States Court of Appeals for the Second Circuit.

### IV. Evidence at Hearing

#### A. Positive and Adverse Factors

At an evidentiary hearing held on March 24, 2005, both parties had an opportunity to present evidence. Counsel for the defendant began by calling members of his family.

#### 1. Mother: Ivy Johnson

Ivy Johnson, the defendant's mother, was asked to describe the defendant as a child. She provided the following testimony: "Well, when he was growing up, he was a nice boy. He will go to school, everyday go to school. And he was doing good in school, he was very bright." Mar. 24, 2005 Hrg. Tr. at 8. When asked to describe what the defendant was like, she indicated that he was "very calm and was a nice child. . . . At the time I was living with Richie, Richie was a very nice son and everything like that." *Id.* at 9–10. When asked by counsel for the defendant whether the defendant helped his mother when they lived together, she responded as follows:

Q: Did he help you out?

A: No, sometimes -

Q: Please, slowly.

A: Sometimes I was working too.

Q: I am talking about personal things, in terms of helping you with any personal needs?

A: No. No.

Q: He didn't help you?

A: No. No, anything to help with that. He helped himself and me, I was working.

Q: You were working?

A: Yes.

Q: What was Richard doing?

A: Richard was doing mason work first when I came up here.

Q: He was working?

A: Yes.

Q: Was he supporting his family too?

A: Yes.

Q: I am talking about his relationship with you, what kind of a relationship?

A: We had a good relationship.

Q: Describe that, if you would, please.

A: Responsibilities as a mother.

Q: Was he a good son?

A: He was a nice son.

Q: Did he give you help in anyway? Did he help you with your chores and things around the house?

A: Yes, he would like clean up and wash off things and clean up.

Q: So he took care of the house while you were living there with him?

A: Yes, he clean up for me.

Q: What about his relationship with his children?

A: It was a nice relationship.

Q: How many kids did he have?

A: Two.

.    .    .    .    .

Q: Did he help take care of the kids?

A: Yes, he takes care of the kids.

Q: Was he a good father?

A: Yes, he was a nice father.

Q: What about [his common law wife]?

A: She was a nice girl.

Q: Was she working?

A: Yes, she was here for a year. She learned a trade.

Mar. 24, 2005 Hrg. Tr. at 10–12.

2. Uncle: Donald Johnson

Donald A. Johnson, the defendant's uncle, testified in support of section 212(c) relief. He has known the defendant since birth. Asked about the defendant's situation growing up, he responded:

As a kid, I first went to give him scholarship money when he passed his examination back in Jamaica. That was a big thing back then. I was working at the time. I told him there was a competition among nephews. I said anyone pass, I definitely sponsor them that summer for their books, etcetera, etcetera. And he was the one that came [out] ahead, so I was very proud of him with that, you know.

Mar. 24, 2005 Hrg. Tr. at 17. He testified that the defendant was sent to the United States to pursue his education, since he was a gifted member of the family. "He was excited about the situation, because he was coming here for a better life, to take care of his family that was back home."

*Id.* at 18. Donald Johnson's contact with the defendant increased upon his arrival in the United States, and he testified to that contact:

Q: What contact did you have with him once he came up to the United States?

A: Well, I see him personally. He [came] to my home and we talked. I [would] see him on a constant basis. After school he [would] run to may house.

Q: What can you tell us about the type of person he was growing up here in the United States?

A: He was nice. He was always at my house. . . .

Q: Did there ever come a time that he worked for you?

A: Yes, he did.

Q: Tell us about that, please.

A: I had a couple of properties. I would need people to supervise, take garbage out, and so forth and so on. It was nice, he did it.

.    .    .    .    .

Q: What did Richard do, in terms of helping you manage the property?

A: Make sure I don't get tickets by taking the garbage out, and putting them together and so forth and so on.

Q: Did you pay him for the work that he did?

A: Yes.

Q: What about the vacuum cleaner, appliance company. Did he work for you there?

A: One time he was a salesman for my company.

Q: He was a salesman?

A: Yes.

Q: What can you tell us about his performance as a salesperson?

A: He was pretty good. At one time he got [the] top award for number of sales.

Q: Was he a reliable employee?

A: He was there when necessary.

Q: Do you know specifically when that was?

A: That was about '93 to '95.

Q: He worked for you on a regular basis during that period of time?

A: Yes, he [did].

Q: Both [by] selling appliances and maintaining the properties you own?

A: During that time he was basically selling appliances.

Q: Did you have any problems with him?

A: None at all.

Q: What, if anything, do you know about his relationship to [his common law wife]?

A: Based on what I know, he treats her nice. He did the best he could at the time. What he [could] afford, he did it. That is what I personally see for myself.

Q: What about his children, did you have an opportunity to observe his relationship with his children?

A: That was a decent relationship with the children.

Mar. 24, 2005 Hrg. Tr. at 19–20.

On cross-examination, the government provided a significant fact:

Q: Did you ever file anything with the United States Government, any state or local government, related to Mr. Copeland's employment with you?

A: None.

Q: Do you do that with other employees?

A: Yes.

Q: Why didn't you do it with Mr. Copeland?

A: With Mr. Copeland there wasn't enough income to really mention.

3. Common Law Mother–in–Law: Beverly Lovell

Beverly Lovell, is the mother of the defendant's common law wife, Monique Brown, and the grandmother of their two children. She testified on his behalf:

Q: . . . Let me just ask you this, what can you tell us about the contact that you had an the observations you made about Richard, in terms of dealing with your daughter and your grand-children? Let me break that down for you. How often did you see -

A: Very often. I see Richard as a conscientious and loving and caring father. Very supportive of my daughter and the children.

Q: When you say very supportive of them, can you just elaborate a bit? Tell us what you mean by that.

A: With the homework. My daughter was not well, he was always there for her.

Q: When you say your daughter was not well and he was there for her, tell us what you mean by that.

A: I think what stands out for me is that when she was pregnant, she wasn't feeling well. She was always able to go to him for comfort. . . . she was always able to go to him for comfort. That stands out in my mind when I think of him. He would come to open school nights, we would go together, actually.

Q: This is the open school nights for Richard, the grandchild?

A: Richard Copeland, the grandchild.

Q: What, if anything, do you know about the financial support he provid-

ed for your daughter and to the grandchildren?

A: He provided financial support for the children, yes, he did.

Q: Do you know what kind of work he was doing?

A: He was working with his uncle . . . .

Q: That is an uncle on the other side of the family?

A: His uncle that testified here.

Q: That is on his side of the family?

A: Yes, his mother's brother.

Q: You are aware he was working for Mr. Johnson?

A: Yes, I was.

Q: Do you know what kind of work he was doing?

A: He was a salesman selling vacuum cleaners.

Q: Would he talk about that in your presence?

A: Yes. He also gave me a vacuum cleaner. It was a used one. They would trade a vacuum cleaner when the client purchased a vacuum cleaner, and trade it in.

Q: In terms of your grandchildren, tell us everything you can about what you remember about his relationship with them.

A: He didn't get to spend much time with Tyler, which is the youngest child.

Q: Why was that?

A: Because he was incarcerated. Richard, they had a loving, caring, supportive relationship. They played, helped with homework, and he helped with his education. And Richard's education as a whole. He is very caring. As a matter of fact, my family has adopted him as our child as well. He is like a son to me. That is why I am here today.

Mar. 24, 2005 Tr. at 24–27.

On cross-examination, the government developed the following details:

Q: You spoke before about Mr. Copeland providing financial support.

A: Yes.

Q. Other than his work with Mr. Johnson, are you aware of any other means by which Mr. Copeland was able to secure support, financial support for his children?

A: After his conviction, I found out that he was doing—he was, you know, he was doing illegal activities. But prior to that I had no idea, prior to coming—prior to being convicted.

Mar. 24, 2005 Hrg. Tr. at 30.

### 4. Aunt: Cymlyn Chambers

Cymlyn Chambers is the sister of the defendant's father. She is also his legal sister based on his adoption by his grandmother. She provided testimony on the defendant's behalf:

Q: From the time that Richard came to live with your mother until his incarceration, how much contact did you have with him?

A: Well, a lot. When he came up, I had a smaller brother, approximately two years older than Richard. They grew up together. They went to school together. I visited my mom there weekly or so, and Richard was in the house and he comes to my house. We meet for family, Thanksgiving and Christmas, the holidays, and birthdays, whatever.

Q: What do you know about Richard's progress with his education?

A: Richard happened to be, he was real bright when he was going to junior high and high school. If this is

relative, I have a daughter who is about the same age as Richard and Richard was really brighter than her and helped her.

Q: What does she do now, by the way?

A: She is now a medical resident at Brooklyn Hospital. They were going head and head with education, but he was [the] brighter of the two. So I know fairly well in those years he was doing very well, looked very promising.

Q: What kind of a person was he in your experience?

A: He was just like any one of my children. He calls me Sis Pam.

Q: Sis Pam?

A: Yes. Sis Pam. Pam is a pet name that he calls me and he calls me Sis Pam. He is very loving. He is always in contact. He calls or comes by for the holiday time until the time that he was incarcerated.

Q: Did you have any relationship or experience with his children and their mother Monique?

A: They come by, too, when it is holiday time. They come to visit and we have gifts, or whatever.

Q: Were you able to observe the nature of the relationship he had with his children and their mother?

A: The children, he totes them around, the daughter. But Richard he is really very close.

Q: Richard Jr.?

A: Is very close to him and he loves his dad.

Q: Were you aware or did you have any understanding of what kind of work he did?

A: I know when he was doing this Kirby thing, because he wanted me to—I had a Sears vacuum and he was encouraging me to get rid of that and get a Kirby. But I couldn't afford a Kirby then, but I know when he was doing that.

Q: He tried to sell you a vacuum? I should say, he was selling vacuum cleaners, to your knowledge?

A: Yes.

Mar. 24, 2005 Hrg. Tr. at 38.

On cross-examination, the government inquired about the contents of a letter Ms. Chambers sent on the defendant's behalf:

Q: You indicate in [your] letter that Mr. Copeland had made some mistakes. What do you mean by that?

.     .     .     .     .

Q: What is your understanding specifically of the mistakes that Mr. Copeland made that you are referring to in this letter?

A: Having to [do with] drugs and whatever he is charged for.

Q: Can you be more specific than that?

A: It was some drug-related charges, guns or drugs or something like that.

Mar. 24, 2005 Hrg. Tr. at 40.

5. Proffered Testimony of Monique Brown: Beverly Lovell

When it became clear that Monique Brown, the defendant's common law wife, might not make it to the hearing, counsel for the defendant re-called her mother, Beverly Lovell:

Q: Do you know if [Monique Brown] was planning to be here today?

A: She is supposed to be in transit coming here. I spoke to her this morning. I spoke to her last night and I talked to her again this morning, she said she is on her way. She is trying to make it here. She didn't want to leave the children, because

she didn't want them to be out of school.

. . . . .

Q: Do you know what happened in terms of her plans to be here? What was related to that?

A: She wanted to be here to testify on Richard's behalf. The children love him, they want him to be involved in their lives. It is very difficult for her.

Q: Let me get to that. As far as you know, she had planned to be here today.

A: Yes, definitely.

Q: In case she doesn't get here, let me ask you this. Are you aware of what hardships were endured by your daughter and Mr. Copeland's children as a result of his deportation?

A: As a result she had to go on public assistance. And it becomes very difficult for her to take on the responsibility. She is also attending school. She went back to school. It is very difficult for her. So she decided to move to North Carolina. Because she thought it would be much easier to raise the children there and in a better environment. It is much more conducive to them.

Q: As their grandmother, are you aware of the impact that Mr. Copeland's deportation had on them as children?

A: Yes, I am very close with my grandchildren. I take [an] active role in their lives, making sure homework is done, making sure they are well behaved. They are following the regulations of the home. I stay in contact with them on a weekly basis. Sometimes daily. They miss their father, especially Richard. Richard needs his father. He is 16 years old now. He needs a father.

Mar. 24, 2005 Hrg. Tr. at 43–45.

On cross-examination, the government elicited the following:

Q: Do you know when it was your daughter went on public assistance?

A: She went on after Richard left. I can't remember the year.

Q: To your knowledge, did she ever receive any public assistance prior to the time that Mr. Copeland went away?

A: Yes, I think she did.

Q: Is it a fact that she was on welfare prior to Mr. Copeland going away?

A: I can't recall. When he went away the last time she was on welfare.

Q: When you say go away, what do you mean?

A: Incarcerated.

Q: That was in 1995.

A: Yes.

Q: Did she remain on public assistance until he was deported from the United States in 1998?

A: She went on public assistance until she moved to North Carolina. I can't remember the year she moved, but her daughter was about—my granddaughter was about two years old.

Q: Your granddaughter was born in 1995, is that right?

A: Yes.

Q: Do you know how long it was prior to Mr. Copeland being incarcerated that your daughter was born?

A: That his daughter was born?

Q: Yes.

A: She was only a few months.

Q: Would it have been around 1996 or 1997 when your daughter moved to North Carolina?

A: I can't recall specifically the dates. Mar. 24, 2005 Hrg. Tr. at 45–46.

### 6. Aunt: Alesia Yoyo

Alesia Yoyo is the sister of the defendant's father and the sister of Cymlyn Chambers. When asked to discuss her recollection of the defendant at the time when he had just arrived in the United States from Jamaica, she gave the following response:

A: Well, I was living here when he came. I was living like a block away from my mother's house. He came and was staying with my mom. I have two other brothers. One is older than Richard, about three years. And one is younger than Richard, about two years.

They all went to school together, because when he came he [had] been going to high school in Jamaica. When we brought him here and we took him to Board of Education, he was very tiny for his age, he was 12 looking like a nine or ten year old. They did not want to put him in high school.

So my mom put him in private school. He went to Prince of Peace Parochial School, with my other two brothers until he graduated. He was a very good kid. He went to church with us. We had a mass choir in church, he was on the mass choir in church.

. . . . .

Q: In terms of his social situations, are you familiar with his social personality?

A: I used to speak with him. At the time when he came, I was in college. He was okay. He always, when I [would] go to the house, if my mom [had] to go away, I was the one that would take care of them.

Q: Did that occur regularly?

A: Maybe three times a year. . . .

Q: You would take care of Richard during that period of time?

A: Yes.

Q: Did he ever present any problems to you?

A: No, he was good. Gets up on time and goes to school. He was good.

. . . . .

Q: Did you ever become aware of any kind of work that Richard did?

A: I only know that he was selling.

Q: For?

A: The Kirby.

Q: For the record, what is the Kirby?

A: A vacuum.

Q: Vacuum cleaners, okay.

Mar. 24, 2005 Hrg. Tr. at 51–53.

### 7. Defendant: Richard Copeland

The defendant provided extensive testimony in support of his case. The following excerpts serve to capture its essence:

#### a. Family History

Q: So why don't we start by telling us as much as you can about your childhood and your ultimate travel and entering into the United States.

A: Well, I born in Jamaica. I stayed in Jamaica until I was like 12 years old. I migrate to America to stay with my grandmother. I went to the school next door. After graduation I went to Lafayette High School. Then my grandmother moved and she bought another house and we moved over to that house. While I was going to high school, I kind of got into the wrong crowd and eventually me and my grandmother start bumping heads. I start coming in late. She would, you know, not putting up with it. Eventu-

ally when I have was like 16 or 16 plus.

.     .     .     .     .

Q: Talk a little bit about your social situation, your economic situation in Jamaica as well. Your family situation in Jamaica.

A: My mother had it pretty hard. My grandmother, my father and my aunts, their side of the family, that is why my grandmother adopted me and tried to make things better for me.

Q: At least for a period of time were things better for you?

A: Yes, it was better. To that I am grateful.

Q: So once you were in the United States in terms [of] being in school up here and living with your grandmother, tell us about how things were going there.

A: Things were going real good. She taught me a lot of stuff, how to do it, and I just messed it up.

Q: Let's talk about that. How do you feel you messed it up?

A: They saw so much in me and I didn't see for myself.

Mar. 24, 2005 Hrg. Tr. at 56–57.

b. Work History

Q: Mr. Copeland, let's step aside from those issues for a moment and focus on your family situation and your work history. Okay? Tell us about that, if you would.

A: Yeah, I used to work with my uncle and sell the Kirby vacuums. It is a situation where you work by commission. So if you don't sell, you don't get paid, you know. So at times it is kind of rough sometimes when you can't even make a sale. I guess at those times I just did other stuff.

Q: We are going get to the problems with the law in a moment. But what, if any, other legitimate work did you do?

A: From time-to-time I do like painting, mason work and stuff like that.

Q: Did you do any other work for your uncle?

A: Yes, maintain the buildings.

Q: Under what circumstances was that?

A: At the same time that I was working with him.

Q: Right. But how is it that you were doing work on other things for him?

A: Because he have buildings and I paint and make sure the garbage is handled. And everything is covered and in order.

Mar. 24, 2005 Hrg. Tr. at 58.

c. Common Law Wife and Children

Q: Monique Brown, let's talk about your relationship with her. How did that start and how did it progress?

A: We met in school. We went to the same school.

Q: When you say school, which school was that?

A: Lafayette High School.

Q: You met her in high school?

A: Yes.

Q: Tell me about the relationship with her.

A: I met her in like '85. We just hit it off. We were head over heels for each other, you know. I met her family. I brought her to meet my family. We just kept going every since.

Q: Did there come a point where you had children together?

A: Yes.

Q: When was that?

A: We had a son July 16, 1988.

Q: What is his name?

A: Richard Copeland. And I have a daughter—we had a daughter April of 1995. That is about six months before I got arrested the last time.

Q: What is her name?

A: Monique—[Tyler] Brown.

Q: We will get to your issues with the law. Up until the time that you were arrested what, was your relationship Ms. Brown like?

A: It was good.

Q: And your children?

A: Everything was good. We had an apartment together.

Q: You lived together?

A: I was going to school. We do everything together.

Q: In terms of supporting them what, if anything, did you contribute to their support?

A: I supported them, with the clothing and food. We basically had everything going as a normal family.

Q: You all lived together as a family?

A: Yes.

Q: To this day, do you still have a good relationship with Monique Brown?

A: We have a good relationship. Every time, twice now I have been incarcerated. And she always been there. She was always in touch.

Q: When was the last time you spoke to her?

A: Yesterday.

Q: Last night?

A: Yes.

Q: Your children, what relationship have you maintained with your children?

A: Being that I am incarcerated, I try to keep as close to them, having a conversation with them, writing to them and stuff like that, to know that they got a father.

Q: Do you give any advice to your son in particular?

A: Yes. My footsteps ain't the way to go. That is what I try to tell him.

Mar. 24, 2005 Hrg. Tr. at 59–61.

d. Criminal History

Q: ... Let's talk about your problems with the law. Going back to your first encounter with the grand larceny charge back in 1988. Can you tell us a little bit about that?

A: The grand larceny charge, that is a one time I was on a block and we had a guy that rent cars for the guys. He rent a car for me and the car got overdue. I got caught, I didn't know that, in the car. And they charged me with stolen car, but later on the charges was dropped.

Q: Did you plead guilty to something in connection with that?

A: No, it was a disposition.

Q: Disorderly conduct?

A: Yeah.

Q: You plead guilty to disorderly conduct?

A: Yes.

Q: Which is not a crime, but a violation of the law, is that correct?

A: Yes.

Q: There came a time when you were arrested for criminal possession of a weapon in the third degree. Do you remember that? In 1989?

A: In 1989, again on the same block I was hanging out in the building. And a lot of guys were there and talking on the steps. The police came and entered the building and the guys run. I was the only one that got caught, I was at the foot of the steps. And they

found the gun and drugs up the stairs. That is how I got charged with that.

Q: Did you ultimately plead guilty to that charge?

A: Yes.

Q: Several years later?

A: Several years later.

Q: In 1993 were you arrested for selling drugs?

A: Yes.

Q: What happened in that case? Did you plead guilty?

A: I plead guilty at the same time with the '95 case.

Q: Let's get to that '95 case. You were originally arrested for attempted murder, correct?

A: Yes.

Q: You pled guilty to possession of a weapon, correct?

A: Yes.

Q: Can you tell us the circumstances of how that occurred?

A: The circumstances is, in '95 I had a friend, somewhat of an associate, he loaned me $1,000. And he said I should pay him some interest on it. I couldn't come up with the money to pay him. He goes on for like months where I am like hiding from him, and calling and sending people or whatever. And one day I was on the Eastern Parkway and they put me up in a car and drive me around.

Q: Who is they?

A: Well—

Q: Do you know his name?

A: The other friend, the guy that took me?

Q: The guy that you owed the money to.

A: His name is Derrick. We called him Track. Track is the nickname.

Q: What happened?

A: They ordered me in the car. I went in the car. They was like they are not going to do me nothing or whatever, they just want their money. And I got to pay them.

Q: Let me just back you up a second. Prior to them ordering you into the car that day, had there been any contact with him regarding the money?

A: The only contact was the phone call, leaving messages and stuff and passing by. I was like hiding from him.

Q: You were hiding from him or trying to stay away from him?

A: Yes.

Q: He found you that day on Eastern Parkway?

A: Right.

Q: What happened?

A: I got in the car. They drove me around the block. While I am in the car, one saying they are going to do me in. Another one is saying just get the money or whatever. When we went around like four blocks and came under a stop light at Eastern Parkway and Bedford, I make an attempt to come out of the car. And they locked the door and the door keep locking I open the door and come out of the car. He came out of the car, pointing a gun. I grabbed him.

Q: Who pointed the gun at you?

A: Track.

Q: Derrick?

A: Yes. He pointed the gun at me. I grabbed the gun. The gun go off, I think like two times. He got shot. Then I fled the scene.

Q: Did there come a point where you were arrested?

A: I was arrested about like two months later at my house.

Q: At that point, there were warrants outstanding for you with regard to the other cases, correct?

A: Yes.

Q: And at that point, what did you do to resolve your cases? How were all those cases resolved?

A: Well, I pled. The lawyer told me that I was going to get time for the two prior warrants. So he had a deal for one at four and a half. He said that was the best thing to plead to, and having to run concurrent.

Q: You pled to?

A: Gun possession.

Q: Gun possession with regard to the incident involving Derrick?

A: Yes.

Q: And you plead to gun possession with regard to the arrest?

A: For all of them.

Q: What did you get for the gun possession that occurred prior?

A: I think a year.

Q: What did you get for—you pled to attempted sale of a controlled substance?

A: Yeah.

Q: What did you get for that?

A: That was a year, too.

Q: Was that one concurrent?

A: That was one [and] a half to four and a half.

Q: Then you were sentenced to one and a half to four and a half for the weapons possession?

A: Right.

Q: And all of this merged, correct?

A: Yes.

Q: So you went to jail from your arrest on September 19, 1995. Do you remember that being the date you were arrested?

A: Yes.

Q: You remained in custody from then on until you were deported, correct?

A: Yes.

Q: At some point following your sentence, the one and a half to four and a half, you were sent to the New York State prison facility in upstate New York, correct?

A: Yes.

Q: What, if anything, did you do in terms of educational or counseling programs when you got to jail?

A: Well, I did electrical trades. I did masonry, because I had prior knowledge of masonry. They had like a program for violent, gun awareness. They had a program called ART, to teach you like ten step points to adjust your attitude or anger when confronted with a situation.

Q: Anger management?

A: Anger management program and a parenting program.

Q: Parenting program?

A: Yes.

Q: You took a parenting program?

A: Yes, sir.

Q: In terms of masonry program, how far did you advance in that?

A: I became a teacher in the masonry program.

Q: You appeared for a deportation hearing, you [were] taken out of prison and brought to a deportation hearing initially in August of '96, correct?

A: Yes.

Q: At this point, let me just back up a second. You were initially taken on August 7th of 1996, correct?

A: Yes.

Q: But you actually had a hearing on November 27, 1996, correct?

A: Yes.

Q: That was the point at which you were told you that you had no relief, is that correct?

A: Yes.

Q: Prior to your appearing at the immigration court for that hearing, had you had any disciplinary infractions while you were in prison?

A: No.

Q: Had you lost any of your good time?

A: No.

Q: Had you been punished in any way for any violations?

A: No sir.

Q: Prior to your appearing before the immigration judge in either August or November of 1996, were you already involved in these various vocational programs and counseling programs in the prison?

A: I was.

Q: Finally, Richard, let me ask you this. Had the immigration judge agreed to waive the deportation, and you had gone onto be paroled from prison, what were your plans?

A: My plan was to get back on the street and find a job, give family support, and continue my education, and do the right thing by my family.

Q: Had you been not deported, you would have been on parole, correct?

A: Yes.

Q: And you would have had guidance and counseling from a parole officer, correct?

A: Yes.

Mar. 24, 2005 Hrg. Tr. at 61–68.

Through the course of an extensive and effective cross-examination, of which only excerpted portions are cited below, the defendant continued to deny his involvement in many of the crimes for which he was convicted, but acknowledged key facts for the first time:

A: I sell drugs on that block.

Q: You sell drugs?

A: Yes.

Q: How long had you been selling drugs? When did you start selling drugs?

A: I will say since I dropped out of high school.

Q: What year?

A: It was like 1988 or 1987.

Q: If it was 1987, it would be even before you turned 18?

A: Yeah, '87.

Q: You turned 18 on November 11, 1987, right?

A: Yes.

Q: So even before you turned 18, you were selling drugs. And you continued selling drugs up until your arrest on September 16, 1995, would that be a correct statement?

A: Yes. On and off.

Q: During that time period, how many times would you say that you sold drugs?

A: A lot.

Q: What does a lot mean?

A: For month, weeks, years.

Q: You sell drugs more than 50 times, would you say?

A: Yes.

Q: More than 100 times?

A: Yes.

Q: More than 500 times?

A: No, I wouldn't say more than 500 times.

Q: More than 250 times?

A: Yes.

Q: Somewhere between 250 and 500?

A: Yes.

Q: The drugs that were there at the time of the March 22, 1989 arrest, you said there were drugs. Were those your drugs?

A: No, those were not my drugs.

Q: What about the weapon? The loaded weapon?

A: That weapon wasn't my weapon.

Q: The drugs weren't yours, the weapon wasn't yours, but you ended up pleading guilty, in any event?

A: Yes.

Q: So you weren't responsible for this crime that you were convicted of, but you ended up pleading guilty anyway?

A: It's not that I wasn't responsible for that crime, but at the time I was selling drugs. But those particular drugs wasn't my drugs.

Q: And the weapon wasn't your weapon.

A: The weapon wasn't my weapon. It just happened that I am on the block, I was selling drugs at the time. And some people, they ran. And I ended up being the one caught with the drugs and the gun.

Q: Do you know whose weapon it was?

A: I don't know.

Q: It wasn't yours?

A: No.

Q: And it was loaded?

A: It was loaded.

Q: During the six-year time period that we are talking about, which is after the bench warrant was issued, up until your September 16, 1995 arrest, you were arrested on a number of other times. You were arrested on a number of other cases, weren't you?

A: Yes.

Q: You gave false answers to the police all of those times, didn't you?

A: Yes.

Q: On February 9th, 1993, you were arrested again?

A: Yes.

Q: At that time, you told the police that your name was Rohan Brown?

A: Yes.

Q: And that was a lie?

A: Yes.

Q: And you also told them that you were born in Japan.

A: No, I did not, sir.

Q: I ask you to look at Exhibit 2, page three. Next to place of birth it says Japan?

A: That must have been some typing error or something.

Q: You don't recall ever telling them you were from Japan?

A: No, never.

Q: Now, in this case, the February 9th, 1993 arrest, you were indicted on 20 counts, isn't that correct? Related to drug sales.

A: I don't recall that, sir.

Q: I ask you to look at Exhibit 7, page six. And I ask you if this refreshes your recollection.

.     .     .     .     .

Q: Does that refresh your recollection?

A: Yes, it refreshes my recollection.

Q: Ultimately—

MR. PADDEN: Objection. Refresh his recollection as to what? Unless I am missing pages here, it is splitting hairs, I suppose, but I don't see the point of—

Q: Does it refresh your recollection that you were arrested on a multiple [19] count indictment related to drug sales?

A: Yes.

Q: You were using a different name at this time?

A: Yes, sir.

Q: It wasn't until you were picked up September 16, 1995 that you ended up pleading out for this offense as well, isn't that correct?

A: That is correct[.]

Q: October 16, 1995, you plead guilty to attempted sale of a controlled substance in the third degree, is that correct?

A: That's correct.

Q: I didn't hear in your testimony any indication that you weren't responsible for this offense. Is it fair to say that, in fact, you did possess this amount of drugs at the time of your arrest?

A: Yes.

.    .    .    .    .

Q: Now I would like to talk about, for a moment, the last arrest. So on September 16, 1995, you were arrested again?

A: Yes.

Q: In this case, you were originally charged with attempted murder and first degree robbery, in addition to the weapon possession, is that correct?

A: That's correct.

Q: At the time of your arrest, you gave your name as Richard Hyatt.

A: Yes.

Q: At that time, you indicated you were a United States citizen, is that correct?

A: I think so.

Q: That was a lie, is that correct?

A: Sure.

Q: The name that you gave to them, Richard Hyatt, was also inaccurate, because that is not the name you use, isn't that correct?

A: Correct.

Q: On October 27, 1995, on your plea of guilty, you were convicted of criminal possession of a weapon in the second degree, is that correct?

A: That's correct.

Q: You plead guilty because on July 26, 1995 you shot someone, didn't you?

A: July 26th?

Q: Right. July 26th was the incident date.

A: Okay, yeah.

Q: And isn't it a fact that you pointed a gun at a man name Derrick Reynolds and demanded money?

A: No, sir.

Q: Isn't it a fact that when you pointed the gun at him, other people stole his money?

A: No, sir.

Q: Isn't it a fact that you shot Mr. Reynolds in the back while he was attempting to flee from you?

A: No, sir.

Q: Isn't it a fact that after you shot him, he fell to the ground and you stood over him and shot him in the throat?

A: No, sir.

Q: Are you aware that Mr. Reynolds was paralyzed from this incident?

A: I knew he was hurt pretty bad. But I heard he wasn't paralyzed.

Mar. 24, 2005 Hrg. Tr. at 79–83, 85–87.

8. Immigration Judge: Keith Williams

Keith C. Williams, an experienced immigration judge called by the government, provided useful background information on section 212(c) determinations along with a persuasive analysis of the defendant's case:

Q: What is your occupation?

A: I am in the private practice of immigration law.

Q: How many years have you practiced law?

A: [In] total, for approximately 32, 33 years.

Q: What year did you graduate law school?

A: I graduated law school in 1972.

Q: What was your first job out of law school?

A: I worked for a small company outside of Chicago called the Duall Corporation, as in-house corporate counsel.

Q: What was your next job after that?

A: Then I was hired by the United States Justice Department, specifically the Immigration and Naturalization Service, to be a naturalization examiner.

Q: What were your duties and responsibilities as a naturalization examiner with the INS?

A: I interviewed and examined applicants for citizenship and their witnesses to determine whether or not they met the statutory requirements for naturalization.

Q: And did [there] come a time when you received a promotion at the INS?

A: Yes.

Q: When was that?

A: In 1977 I was appointed to be the Deputy Assistant Commissioner for Naturalization in Washington, D.C., in the INS headquarters.

Q: What were your duties and responsibilities as deputy to the Assistant Commissioner?

A: I was one of two assistants to the Assistant Commissioner, who was the official in charge of the naturalization program nationwide.

Q: Did there come a time when you received another promotion with the INS?

A: Yes. It was sort of a backhanded promotion, in that my boss was promoted. I took over his function in an acting capacity for approximately two years.

Q: What was his position?

A: He rose to the level of Associate Commissioner for Adjudication, which is two steps down below the Commissioner of the INS.

Q: So you were the acting Assistant Commissioner?

A: I was the acting Assistant Commissioner for Naturalization.

Q: What were your duties and responsibilities as the acting Assistant Commissioner for Naturalization?

A: Basically to prepare the annual budget, to testify before Congress on naturalization matters, to administer in all respect[s] the naturalization program, including the hiring, firing and transfers and what not of the personnel.

Q: Did there come a time when you left the Immigration and Naturalization Service?

A: Yes. In 1983, when the naturalization division, a separate entity, was merged into the then adjudications division, I was offered a judgeship with the newly formed executive office for immigration and review, another component of the Justice Department.

Q: Where were you offered that judgeship?

A: In Chicago, Illinois.

Q: What year did you start work as an immigration judge in Chicago?

A: In January of 1983.

Q: How long did you serve in Chicago?

A: Until January 1984.

Q: Where did you serve next?

A: Then I voluntarily transferred to the Chrome Service Processing Center the INS Detention Center outside of Langley, Florida.

Q: How long did you serve there?

A: I was at the Chrome Detention Center for approximately five and a half years.

Q: For how long a time period did you serve as an immigration judge?

A: In total as an immigration judge, including the Chrome, Downtown Miami and Chicago, for approximately 20 and a half years.

Q: When did you leave the bench?

A: July of 2003.

Q: Now you're in private practice?

A: Yes, I am.

Q: And you are doing immigration law in private practice?

A: Yes.

Q: During the time that you were working as an immigration judge, did you hear cases in any other cities other than Miami?

A: Yes, I heard cases in half a dozen or more of the state prison facilities around the state of Florida. I heard cases in San Juan, Puerto Rico. I heard cases at 26 Federal Plaza here in New York City. I heard cases in Connecticut State Penitentiary, as well as Danbury Federal Correctional Institution.

Q: What are the duties and responsibilities of an immigration judge?

A: [An] [i]mmigration judge is charged with administering the authority that is granted to the Attorney General through the Immigration and Nationality Act, and delegated to immigration judges to conduct deportation exclusion hearing[s] and now, since the Illegal Immigration Reform and Re-sponsibility Act of 1997, what [are] now called removal hearings, but essentially the same thing.

Q: Did these cases ever involve the adjudication applications for waivers of deportation?

A: Yes, quite often.

Q: What type of application for waivers of deportation did you adjudicate?

A: I adjudicated applications under Sections 212(c) and 212(h) and 212(i) of the Immigration and Nationality Act. As well as application for suspension of deportation, under former Section 244(a)(1) of the Act. Political asylum applications. And also applications for cancellation of removal subsequent to the arrival.

Q: During the time period that were you an immigration judge, how many times were you called upon to conduct 212(c) hearings?

A: Hundreds of times.

Q: Are you familiar with decisions of other judges regarding 212(c) waivers?

A: Yes, of course. Judges discuss these things amongst themselves.

Q: And you've read decisions by immigration judges?

A: I have read the decisions of the judges, as well as of the Board of Immigration Appeals.

Q: What is the Board of Immigration Appeals?

A: The Board of Immigration Appeals is a separate component of the executive office for immigration review, which is essentially the first level, the first administrative appellate.

Q: You are familiar with their decisions as well?

A: Yes.

Q: Will you just briefly explain what a 212(c) waiver is and who is eligible for it?

A: A 212(c) waiver is a waiver that is available to long-term permanent residents of the United States. The law requires that they have been permanent residents for a period of at least seven years, lawfully admitted to the United States. And who, if for one reason or another, were subject to deportation from the United States, they could apply for this waiver and perhaps, if granted the waiver, would be allowed to remain residents of the United States, notwithstanding the fact that they remain subject to deportability under the law.

Q: Who is not eligible for a 212(c) waiver?

A: Well, among other people who are not eligible, are people who haven't resided in the United States for the statutory period. People whose residency may not be seen as lawful, because there might be some blemish, perhaps, on their manner of having been granted residency. People who have been convicted for certain types of offenses. Some people who have been convicted for what are called aggravated felonies under Section 101.843 of the act. All persons who have been convicted for firearms, weapons offenses.

Q: Judge Williams, what procedures—

. . . . .

In November of 1996, what procedure would have been followed for conducting a 212(c) hearing?

A: Well, the procedure basically would be that the applicant, and most of them were represented by counsel, but whether or not they are represented by counsel, would have the opportunity to testify, to bring in witnesses, much the way it is done today. To present evidence, documentary evidence on his own behalf. The Immigration and Naturalization Service, the former Immigration Service, could also bring in any documentary evidence or witnesses that they might have concerning his eligibility for 212(c) relief, either statutorily or in the exercise of the Court's discretion.

Q: In November of 1996, what standard would have applied in terms of adjudicating a 212(c) waiver?

A: The standard was the standard outlined in *[Matter] of Marin* which is a Board of Immigration Appeals decision, that is cited at 16 I & N decisions 581(BIA 1978). In the *Matter of Marin*, the instructions were given to the immigration judges that said essentially that an immigration judge was charged with balancing adverse factors of record evidencing an alien[']s undesirability as a permanent resident of the United States, with any social and humane considerations that were presented on his behalf, in order to determine whether or not his continued residency in the United States was in the best interest of the country.

Q: So the bottom line determination at the end of the day is whether the alien being present in the country is in the best interest of the country?

A: Yes.

Q: What are the factors that a court would look at, in terms of making such a determination?

A: The factors are—many of the factors are also outlined in the *Matter of Marin*. The court would look on the positive side of the scale, at such considerations as family ties in the United States, residence of long duration

in this country, whether or not he served in the military, employment history, property or business ties to the community, any community service, any other evidence that might bear on his good moral character. On the negative side, the court would look at the exclusion ground [at] issue, the presence of a criminal record, if so its nature, its recency, its seriousness. And any other evidence that might bear on poor moral character or might demonstrate a person's undesirability as a permanent resident for the United States.

Q: In adjudicating a 212(c) application, how would an immigration judge go about balancing all of those factors?

A: Well, it is a difficult and sometimes tedious process. But the judge basically, and I as I used to explain to *pro se* applicants, imagine the scale of justice. On the one hand places all of the positive factors given—and it is up to the judge to give those factors appropriate weight. On the other hand, the negative factors. Also, the judge has to give appropriate weight on the opposite side of the scale. And basically we see how it balances out. The last of the factors that a judge normally considers is the issue of rehabilitation. Because an immigration judge really does not want to get down to the bottom line and allow to remain in the United States somebody who is likely to continue with criminal activity.

Q: Is it significant in the determination if the applicant is a repeat offender?

A: Yes, it is very significant.

Q: For repeat offenders, is it significant if the crimes are getting more serious?

A: That is also very significant.

Q: Is it significant if the crimes involve violence?

A: Yes, of course. Violent crimes are certainly not only [*malum per se*], if you will, but are certainly against our public policy and detrimental to our community.

Q: Is it significant if the crime involves drugs?

A: The same could be true of drugs. And Congress has seen fit to accord drugs especially harsh treatment under the immigration laws.

Q: Is it significant if the crimes involve weapons?

A: Yes, it is, as well.

Q: What about a loaded weapon?

A: The loaded weapon demonstrates if not violence, certainly the potential for imminent violence involving a weapon.

Q: Would you consider it significant if a person gave false names and Social Security numbers at the time of arrest?

A: That would go into those other factors evidencing an alien's undesirability as a permanent resident. It indicates that this is a person who cannot conduct himself and comport himself in accordance with the law and morality.

Q: You spoke earlier about the issue of rehabilitation. Is that a significant issue?

A: Yes, it is.

Q: How do you evaluate that issue?

A: You basically take into account events subsequent to the criminal activity. The efforts made by somebody to better themselves. Their family support system and how effective that family support system might be, in order to assist them. But what you are really looking for is to see whether or not somebody has turned a cor-

ner in their lives and maybe embarking on a different path.

Q: If the person has been convicted of a number crimes over a number of years, is that something that is relevant in terms of the rehabilitation determination?

A: Certainly. Because the more—the heavier the [negative] factors become, the more positive factors have to be introduced to counterbalance those. And certainly a much greater showing would have to be made before a judge could conclude that somebody with a long criminal history has been rehabilitated.

Q: What if the person was in prison during the time in which he was required to show rehabilitation?

A: The fact of incarceration does not preclude somebody from showing rehabilitation under the law. But in my view, it is more difficult for somebody to demonstrate rehabilitation while they are in a custodial setting.

Q: Is the issue of residence in the United States at an early age and for a long duration significant?

A: That is also something that is taken into account. The question, of course, is what is long duration? Long duration would be a relative thing. If somebody entered the United States at the age of two or three and have been in the United States for five or six years, at that point they have lived in the United States more than half their lives. That would certainly be of long duration. On the other hand, somebody who came to the United States at the age of 15 and was here for 10 years, that might not be seen as such long duration, because it is relative to the person's age and the length of their life.

Q: Is the issue of employment significant?

A: The issue of employment is very significant. It demonstrates stability. It demonstrates contributing to one's own family. And it is something that we expect of people who are able to support themselves.

Q: Is the issue of filing taxes significant?

A: The issue of filing taxes is significant, because the failure to file taxes or to pay taxes or to file tax returns, indicates that one is, once again, not doing what the law requires that they do.

Q: Judge Williams, you've had a chance to sit here and listen to all of the testimony, is that correct?

A: Yes, sir.

Q: You had a chance to review all of the exhibits submitted into evidence, is that correct?

A: I have as well.

Q: Have you formed an opinion on whether in 1996, November 1996, Mr. Copeland would have received a grant of 212(c) relief?

MR. PADDEN: Objection, Your Honor.

THE COURT: I will allow it.

THE WITNESS: Yes, I have formed such an opinion.

Q: What is that opinion?

A: My opinion is that his case would have [been] an exceedingly weak case for 212(c). And that in the exercise of discretion, I believe, would have been denied.

Q: What do you base that on?

A: Based on the facts as they existed in 1996, as well as the law as it existed in 1996.

Q: What do you base your opinion on?

A: I base my opinion essentially on the methodology that I explained earlier. And that is, a balancing of the favorable and unfavorable factors. The thought process that a judge goes through in a 212(c) hearing is one of constantly bouncing back and forth between the positive and negative side of the ledger. And I'll give you [a] for instance. In this particular case, the positive side of the ledger is the fact that he came here at the age of 12. He had been in the United States by the time the 212(c) hearing for more than half his life. But on the other hand, half of that period of time he was, by his own admission and certainly according to the record, engaged in serious criminal activity. So it's an on this hand sort of thing, and then you go on the other hand, but then on the other hand and on the other hand, until you basically run out of considerations.

Q: So what other factors did you consider in coming to your opinion that Mr. Copeland's case would have been exceedingly weak?

A: I considered his criminal history to be extremely serious. I consider the fact that it was increasing in seriousness as time went on. I consider, based on his own testimony, the fact that he sold drugs between 250 and 500 times, which I consider to be quite serious. On the other hand, I considered his family ties. Certainly his family appear[s] to think well of him. Their testimony, however, appeared to be somewhat lukewarm in their support. In a way, it was mostly opinion testimony. It didn't really provide specific facts that a trier of fact could grasp on. I also see a family, who while supportive of Mr. Copeland, seems to have failed to come to grips with the gravity of his criminal misconduct. Whenever questions were put to them about that, they indicated either ignorance of that fact or tried to minimize it.

Q: What about—strike that. Did the issue of employment have any relevance to your decision?

A: It is a factor, it is not the determinative factor. But certainly the lack of employment would demonstrate, in my view, solid employment, long-term employment, that while he has two United States citizen children, that he is not really in a position to be financially supporting those children [to] a large extent. And therefore, his deportation from the United States would not cause them any particular financial hardship.

Q: What about his admission of using false names and Social Security numbers upon arrest? Would that play any role in your decision making process?

A: Once again, it is cumulative. It goes to the other negative factors. And it certainly would indicate to me that the applicant for 212(c) relief is somebody who simply is not a person of moral character, who has lied, who absconded, who provided false evidence, false testimony to law enforcement officers, who when granted probation, violated that probation. This is just generally speaking, not somebody who is obeying the laws of the United States.

Q: What about the issue of rehabilitation? Did you make any determination in regard to that factor?

A: I did. And I considered on the positive side of the ledger the fact that he attended certain courses while incarcerated.

THE COURT: Go ahead. Finish your answer.

THE WITNESS: However, considering the fact that his criminal activity began, by his own admission, sometime in '87 or '88 and continued onto at least the time of his incarceration in 1995, were I hearing a 212(c) case in late 1996, balancing that one-year period of time and those attainments during that relatively short period of time, and balancing that against the serious nature of an extensive nature of his criminal record, I would have to find that even though he might have embarked on rehabilitation, that he was not at the time of the hearing rehabilitated, and not somebody who I would particularly trust to continue to stay out of trouble if allowed to remain in this country.

. . . . .

Q: Based on your familiarity with the opinions of other immigration judges and your familiarity with the BIA decisions, do you have an opinion [of] how others would have adjudicated the defendant's application?

MR. PADDEN: Objection.

THE COURT: I will allow it.

THE WITNESS: I think that any reasonable immigration judge would deny this application.

Q: The defendant has offered in a letter to the Court—strike that. The defendant has indicated in a letter to the Court that there is information that in the past over 50 percent of applications for 212(c) relief were granted. Does that information change your opinion at all?

A: No, it doesn't. Because even were there 50 percent granted at that time, Mr. Copeland's case would have been within the 50 percent that was denied, I am confident.

MR. DUNN: No further questions, Your Honor.

CROSS EXAMINATION

Q: Is it okay to call you Mr. Williams or should I call you Judge Williams?

A: Either is okay.

Q: You said you presided over hundreds of 212(c) hearings?

A: Yes.

Q: In which waiver was sought? Do you have any sense of your own experience as to how many applications were granted percentage wise?

A: In my own courtroom?

Q: Yes.

A: My sense is that it was considerably less than 50 percent.

Q: So your personal experience is that you would have granted less than—

A: I will explain to you why. A great many of the 212(c) applications that I heard, because I was assigned to the Florida state prison circuit, and because I was at the Chrome Service Processing Center, [were] in a custodial setting. And as I indicated earlier, frankly it is harder for people to demonstrate that they have been rehabilitated when they really haven't had the chance to get out on the street and prove it.

Q: Let me ask you this, then. First of all, I take it you didn't do any hearings in the New York State correctional system?

A: No.

Q: Just the 26 Federal Plaza?

A: Right.

Q: And that was—did that involve—strike that. Let me ask you this. Do you think it is possible that someone who, after committing three crimes,

albeit serious, can go to prison for the first time, spend three years in prison, involve themselves in every available vocational, educational and counseling program, come out with a parole officer supervising them, turn their life around and lead a productive law-abiding life?

.    .    .    .    .

THE WITNESS: It is certainly possible.

MR. PADDEN: That is all that I have, Judge.

THE COURT: Well I have just a few questions, Judge. This is somewhat subjective, is it not?

THE WITNESS: There is a certain amount of subjectivity in it. The adjudication of this is certainly not with mathematical formula.

THE COURT: So there are some variations among the judges?

THE WITNESS: There certainly are.

THE COURT: Is it possible for you to put in terms of probabilities how probable it would have been, at the time of this hearing and shortly thereafter, that a judge would have granted a 212(c) application?

THE WITNESS: Based on these facts, I would consider it to be highly improbable that a judge would have granted a 212(c).

THE COURT: Can you quantify that?

THE WITNESS: You mean percentage wise?

THE COURT: Yes.

THE WITNESS: Well, let me answer that a slightly different way. Judges can disagree amongst themselves as to Judge A would have granted it, Judge B would have denied it. But those are usually judges that fall within a permissible center. I mean, there is no absolute correct answer, but there is the permissible middle. In this particular case, I think that these facts fall outside of that permissible middle. It is my belief that even were 80 percent applications granted, that this would nevertheless be in the 20 percent denied.

THE COURT: So it is more than a preponderance, as an estimate of the probability of denial? ... I am asking you about the probability of a grant, given these facts. As I understand it, it is at least more probable than not that it would not have been granted?

THE WITNESS: Yes, I will agree with that.

THE COURT: It is highly probable that it would not have been granted, [defining] highly probable in the order of 80 percent or so?

THE WITNESS: Yes, I could also say that.

THE COURT: Is it beyond a reasonable doubt probable [where] the finding of reasonable doubt is 90 percent or more?

THE WITNESS: I think I would be hard pressed to say that.

THE COURT: But at least the standard that could be applied here is clear and convincing evidence, which is somewhere in the order of 75 or 80 percent. And you would find then by clear and convincing evidence that it would not have been granted?

THE WITNESS: Yes.

THE COURT: Any further questions?

MR. PADDEN: No, Judge.

MR. DUNN: No, Your Honor.

THE COURT: Thank you, sir.

MR. DUNN: Thank you, Judge. Mar. 24, 2005 Hrg. Tr. at 111–33.

After all was said and done, this experienced administrative judge provided a cogent answer to the question of the Court of Appeals: by a standard of clear, unequivocal and convincing evidence, section 212(c) would not have been afforded defendant.

## V.   Application of Law to Facts

### A.   Balancing Factors

#### 1.   Generally

■ This is a troubling case, in part because it involves a non-citizen with a serious criminal record. More troubling still is that the United States Court of Appeals for the Second Circuit has asked the district court to determine—not what did happen, or what likely happened—but what might have happened had the defendant been permitted to seek section 212(c) relief.

■ The relevant time period for the prejudice inquiry is November 27, 1996, the date of the fundamental procedural error in defendant's deportation proceeding. *See United States v. Scott,* 394 F.3d 111, 119 (2d Cir.2005) ("[T]he district court should reconstruct events as they existed at the time of the disputed deportation proceeding, without considering future occurrences.").

■ As described in Part III.C, *supra,* potential adverse factors include the nature and circumstances of the exclusion ground at issue, the presence of additional immigration law violations, the existence of a criminal record and its nature, recency and seriousness, and the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident. Possible favorable factors include family ties within this country, residence of long duration in this country, arrival in the country at a young age, evidence of hardship to the alien and the alien's family upon deportation, Armed Forces service, employment history, community service, property or business ties, other evidence attesting to good character, and, in the case of one convicted of criminal conduct, proof of genuine rehabilitation.

Given the gravity of the defendant's criminal record, he almost certainly would have been required to demonstrate the existence of unusual or outstanding countervailing equities in order to obtain section 212(c) relief. There is no question that in 1996, serious drug crimes, particularly those involving sale or trafficking, triggered significantly stricter scrutiny, and required a showing of unusual or outstanding equities before discretionary relief would be considered. *See, e.g., Matter of Burbano,* 20 I. & N. Dec. 872, 878 (BIA 1994) ("[A]n alien who has committed a serious drug offense will face a difficult task in establishing that he or she merits discretionary relief. The detrimental effect on society resulting from drug violations has been consistently recognized by Congress in the clear distinctions that have been drawn between drug offenses and other crimes . . . ."). In fact, at one point, the BIA was forced to rebut suggestions that it would not grant relief to individuals convicted of drug crimes: "We emphasize that this observation should not be taken as an indication that the Board will never award relief to an alien convicted of a serious drug offense." *Id.* at 879.

The necessity of demonstrating unusual or outstanding equities is not exclusively triggered by serious crimes involving controlled substances . . . . One must examine the gravity of the offense, *per se.* In addition, such a showing may be mandated because of a single serious crime, as in *Marin,* or because of a succession of criminal acts, which to-

gether establish a pattern of serious criminal misconduct. . . .

In regard to the adverse factors in this case, we note that the respondent, an admitted drug user, has been convicted of two serious offenses, one involving the attempted sale of heroin, and the other entailing attempted robbery, in which firearms were carried and an innocent bystander physically restrained. We further observe that the second crime was committed while the respondent was still under probation for his first offense. Given the serious nature of these crimes and their relative recency, it is necessary for the respondent to demonstrate unusual and outstanding equities in order for a favorable exercise of discretion to be considered.

*Matter of Buscemi,* 19 I. & N. Dec. 628, 633–34 (BIA 1988).

### 2. Adverse Factors

Like the defendant in *Matter of Buscemi,* the defendant's criminal record included a serious drug offense based on the attempted sale of a controlled substance, and an offense involving a firearm and an innocent bystander, who in the defendant's case was not only restrained, but shot and paralyzed. That crime occurred on September 16, 1995, just over a year before the defendant's immigration hearing.

The question of whether the equities presented in the defendant's case suffice to meet the "unusual and outstanding" standard need not be reached. Even if the defendant were not required to make such a showing, the court finds by clear, unequivocal and convincing evidence that he would not have obtained relief. He has failed to establish sufficient ordinary equities, much less extraordinary equities, that would have led immigration judge to determine that it would be in the best interests of the United States to grant him relief,

given his extraordinarily serious criminal record. A balancing of the relevant factors in this case supports the conclusion that there is no reasonable probability that the defendant would have received section 212(c) relief, had he been given the opportunity to apply for it.

#### a. Nature of Exclusion Ground at Issue

The nature and circumstances of the defendant's exclusion ground amount to a significant adverse factor. The basis for defendant's removal is his conviction for a drug-trafficking offense. At the time of the defendant's deportation it was well-established that trafficking in drugs was a serious crime, which could, given the particular facts and circumstances of a case, justify the denial of discretionary immigration relief. The United States Court of Appeals and the Board of Immigration Appeals had both signaled that drug crimes were of particular concern in immigration determinations. *See* Part III.D, *supra.*

#### b. Presence of Additional Immigration Law Violations

It is unclear whether the defendant's repeated use of false identifying information would have been counted as an additional immigration law violation or as evidence of bad character. To avoid "double counting" this information, it seems reasonable to assume that an IJ would have treated this information as evidence of bad character rather than considering it as proof of additional immigration law violations.

#### c. Criminal Record and its Nature, Recency, and Seriousness

In the defendant's case, the adverse factor of criminality includes, in addition to the drug trafficking conviction, two firearms convictions along with the defen-

dant's admitted sale of drugs on more than 250 occasions. Firearms convictions, like drug convictions, would have been given considerable weight in determining whether the defendant's remaining in the United States would have been in the country's best interest. The offense conduct underlying one of the firearms convictions, moreover, included the defendant's paralyzing a victim with a shot to the throat. The recency of his serious criminal conduct to the deportation hearing would have been an important factor. *See, e.g., Matter of Salmon,* 16 I. & N. Dec. 734, 737–38 (BIA 1978) ("We [have] observed that confined aliens and those who have recently committed criminal acts will have a more difficult task in showing that discretion should be exercised in their behalf than aliens who have committed the same offense in the more distant past."). The defendant's criminal conduct also appeared to be increasing in severity over time. His testimony at the hearing would have suggested to a reasonable immigration judge that it was his drug trafficking activities that led to the shooting of the defendant's "associate." To allow a violent drug dealer to remain in the country would have been difficult to justify.

At the March 24, 2005 evidentiary hearing, the government introduced a useful chart chronicling key details of the defendant's serious criminal record:

United States v. COPELAND

d. Presence of Other Evidence of Bad Character

On multiple occasions the defendant provided authorities with false information in an effort to conceal his identity, at the peril of innocent parties. He fled in violation of court orders so that arrest warrants had to be issued for his capture. The defendant remained a fugitive for years, despite his knowledge that he was wanted by the authorities, and thereby thwarted efforts by law enforcement to bring him to justice on serious pending charges. His consistent efforts to obstruct justice complete the overall picture of someone whose continued residence in the United States would not have appeared to virtually any immigration judge to be in the country's best interest.

Telling was his continued evasiveness at the March 24, 2005 hearing. The defendant's energies were directed more toward denying crimes to which he had pled guilty than to demonstrating that he merited relief on the basis of his positive factors. His evasiveness was marked to the point that his testimony could have been largely disregarded as deceptive. At one moment in his cross-examination, for instance, he testified as follows:

Q: Other than the four crimes that you were convicted for, and the 250 and 500 times that you sold drugs, did you commit any other crimes?

A: I have probably committed other things that I didn't get caught for.

Q: For example?

A: Selling drugs.

Q: Other than selling drugs?

A: No, that is about it.

Q: What about possessing a weapon?

A: No.

Q: You never possessed a weapon?

A: I never personally owned a weapon. But at the time, I knew how to get a weapon.

Q: Okay. Did you ever get a weapon?

A: No.

Q: Did there ever come a time where you were [possessing] a weapon? At any point in time from your arrival in the United States to your deportation in 1995—to your arrest in 1995, did you ever possess a weapon?

A: I think after the [shooting] incident, because I kinda figured his friends would retaliate against me.

Q: Up until that point you never even held a weapon in your hand?

A: Yes, I held a weapon before.

Q: Why had you held a weapon in your hand?

A: Because I knew people who had weapons.

Q: And your work was scary. Is that why you held it?

A: If I was scared?

Q: I'm sorry. Let me backtrack. You held weapons in your hands because people who you knew gave you the weapons to hold, is that your testimony?

A: Yes. Guys, they would show their weapons and talk and all that. That would be for a few incidents where I would hold a weapon.

Q: But you never carried a weapon around for your own protection?

A: No.

Q: And the first time you did that, according to your testimony, was after this July 26, 1995 incident.

A: Yes.

Q: And then you carried a weapon around?

A: Yes.

Q: Was that a weapon that you were legally permitted to carry around or no?

A: No, sir.

Mar. 24, 2005 Hrg. Tr. at 93–94.

A cursory examination of the transcript in this case provides a significant glimpse into the balancing of factors. The defendant's criminal history takes up the lion's share of space, and even within his own testimony, the majority is spent nitpicking the details of his criminal acts, rather than providing a sense of his family relationships or of his accomplishments.

The defendant's deceptiveness suggests a lack of remorse for a criminal history that is exceptional even when compared with the serious criminal histories of similarly situated defendants. He cannot hope to demonstrate rehabilitation when he will not concede that his criminal acts necessitated a change in conduct and attitude. See, e.g., Matter of Coelho, 20 I. & N. Dec. 464, 470 (BIA 1992) ("During his testimony at the deportation hearing, the respondent was unwilling to give straightforward answers in response to the Service's questioning. The respondent did not express any remorse and was unwilling to provide details regarding his cocaine transactions."). When confronted with his repeated lies to law enforcement and his failure to comply with judicial orders—in the form of aliases and absconding—the defendant's demeanor was dismissive, and he confirmed this behavior without a sign of concern. See, e.g., Mar. 24, 2005 Hrg. Tr. at 85 ("Q: That was a lie [to law enforcement], is that correct? A: Sure.").

The final indicator of bad character that the court considers for purposes of determining whether the defendant's continued residency in the United States would have been deemed desirable by an immigration judge, is the devotion of his high intelligence, noted by all who testified on his behalf, to criminal enterprises. The defendant, by all accounts, was a gifted youth. Because of his intellectual achievements, he was afforded an opportunity to come to the United States from Jamaica to pursue his education. One of the relatives who submitted a letter on his behalf, but did not testify at the hearing, described his opportunity as follows:

Ritchie was often described as being bright and having outstanding potential .... My grandmother, a very proud, godly woman brought Ritchie, my uncle's son, as a child to America from our native Jamaica. She envisioned a better opportunity for her whole family here and despite the tense environment in Jamaica[,] she spotted great potential in Ritchie. I think in striving for a better life, both my grandmother and Ritchie crossed paths. In making his choices, he lost her faith and respect ....

Jul. 24, 2002 Ltr. of Kimerliann Chambers at 1. The rest of his family, from their appearance and testimony at the hearing, has worked hard and done well both in Jamaica and this country. Rather than taking advantage of the great opportunity he was given, based on his natural intellectual abilities, the defendant—before the age of 18—began turning those abilities to a life of crime. While the standard of Alexander Hamilton, who was sent to the United States from a Caribbean island to pursue his education, cannot be the benchmark, still, the defendant's failure to take advantage of his good fortune is striking.

The defendant's squandering of his opportunity and putting his talent to criminal use do not suggest a person that an immigration judge would have looked upon favorably. This conclusion was further reflected in the defendant's strategic deceptiveness during the hearing and his lies to law enforcement when arrested. See, e.g., Mar. 24, 2005 Tr. at 61 ("Q: Did

you plead guilty to something in connection with that? A: No, it was a disposition. Q: Disorderly conduct? A: Yeah. You plead guilty to disorderly conduct? A: Yes."). It also suggests that the defendant should have known that when he lied to law enforcement about his name, social security number, and other identifying information, he was acting improperly.

### 3. Positive Factors

#### a. Family Ties

It does appear, based on the testimony before the court, that the defendant shared a meaningful relationship with his common law wife, with whom he has been since high school. The court credits the allegation of Beverly Lovell, the grandmother of his children, that Monique Brown wished to attend the hearing. Her failure to testify will not be considered an adverse factor, and her relationship with the defendant, as indicated above, is deemed a positive factor. Monique Brown's letter to the court indicating her support for the defendant is also considered favorably:

> My name is Monique Brown[.] I have two children by Richard Anthony Copeland. Their names are Richard Copeland Jr. and Tyler Brown[.] Tyler is seven years old and [Richard] is fourteen and both are in need of their father.
>
> Richard is a family man, he is very kind hearted and puts people before himself. Richard has always been there for his children mentally, financially and physically. He is much needed where my children are concerned. I've been a single mom for almost six years, which has been very difficult.

Jul. 30, 2002 Ltr. The court assumes that Ms. Brown would have provided live testimony similar in substance to that submitted in her letter on the defendant's behalf.

Other testimony indicated that the defendant is close to his son, Richard Copeland, Jr. and wishes to be a part of his life. Richard Copeland, Jr.'s letter is taken into consideration:

> I am Richard Anthony Copeland Jr. My father is very kind. He's always giving things to people that really need it. I remember he use[d] to take me and my sister Tyler to the movies and the mall. He was a big asset to my family. My dad used to help me with my homework, and pick me up from school when my mom use[d] to work at KCA and couldn't pick me up from football practice. My dad took Tyler and I to Kissimmee, FL to take us to Disney World. I really miss my dad can you please let him out.

Undated Ltr.

The testimony demonstrated that, because of his incarceration, the defendant was never able to develop a close relationship with his daughter, who was born just before he went to prison.

The court considers as a part of the "family ties" positive factor the fact that many members of the defendant's family came to testify on his behalf, in addition to providing letters of support. Letters were provided by numerous individuals who did not attend the hearing. The court gives those letters substantial weight.

The testimony of his family members and the letters submitted on his behalf, however, ultimately gave the impression of a family that felt obliged rather than eager to defend one of its members. The court is in agreement with Keith Williams, the seasoned immigration judge called by the government as a witness in the case, who accurately described the defendant's family support as "lukewarm." While it is true that the defendant has significant family ties in the United States and apparently few ties in Jamaica, he does not appear to

be especially close to his extended family, and it seems likely that this factor would not have carried the day in a section 212(c) determination.

### b. Residence of Long Duration

The defendant argues that his residence in the United States has been of long duration, beginning when he entered the United States in 1982 at age 12. While the defendant had resided in the United States for over fourteen years by the time of his deportation proceeding, his length of residence would have been entitled to significantly less weight because it was "marked by participation in criminal activity." *Douglas v. INS,* 28 F.3d 241, 245 (2d Cir.1994) (giving non-citizen's twenty-year residence little weight due to criminal activity). His narcotics trafficking, by his own admission, began before he turned 18. By the time of his deportation proceedings, more than half of the defendant's time in the United States had been marked by serious criminal activity.

### c. Arrival at a Young Age

The defendant entered the United States at the age of twelve. His arrival at a young age would have constituted a positive factor to be considered on his behalf. As with his positive equity relating to residence of long duration, the defendant's criminal conduct at a young age would have undermined the positive equity relating to arrival when he was young. It is nevertheless a factor that would have been weighed against adverse factors.

### d. Hardship to the Alien and His Family

There is very little evidence that the defendant's deportation would cause financial hardship to his family. There is no evidence that he ever provided legally obtained substantial financial support to his common law wife and children. Support provided appears to have come from his illegal drug-dealing activities.

There is no question that deportation will cause emotional hardship to his immediate family. He will no doubt be missed by his common law wife and the son with whom he apparently was able to form a solid relationship. He has not lived with either of them since 1995, however, and so this separation, while greater in distance, will not radically alter the *status quo.* The banishment of a non-citizen from the country and the separation of a family is always a significant factor, particular when the family includes young children who need the love and support of their parents. In this case, however, an immigration judge likely would have concluded that the defendant's egregious disrespect for the laws of this country amounted, on some level, to disrespect for the family that would ultimately be broken apart.

There is no evidence that the defendant will have great difficulty residing in Jamaica. Nevertheless, the court assumes he will have problems earning a livelihood there. His deportation, as in the case of many like deportations, has a tendency to increase crime abroad, but this is not a factor an IJ would have considered.

### e. Armed Forces Service

The defendant was never a member of the United States Armed Forces.

### f. Employment History

The defendant's legal employment history is not sufficient to merit consideration. *See, e.g., Arango–Aradondo v. INS,* 13 F.3d 610, 613 (2d Cir.1994) (noting non-citizen's sporadic employment record and failure to pay taxes); *Vlassis v. INS,* 963 F.2d 547, 550 (2d Cir.1992) (deeming employment record suspect where non-citizen claimed that he was paid "off the books"

by family members). Though the defendant allegedly assisted his uncle with various properties and in his vacuum sales business, there is no written record of this work, and it appears to have been at best sporadic. By his own admission, the defendant's most consistent "work" took the form of hundreds of illegal drug sales.

### g. Community Service

There is no evidence that the defendant ever engaged in community service.

### h. Property or Business Ties

There is no evidence that the defendant possessed any property or business ties in the United States for purposes of establishing that his remaining in the country would be in the best interests of the United States.

### i. Other Evidence of Good Character

There is no other evidence of good character that an administrative judge would have been able to consider. The testimony and letters of several of the defendant's family members were relatively devoid of evidence of good character except for general statements that he was a "nice" or "loving" man. There was almost no anecdotal evidence of good character, apart from what has already been considered as a positive factor in connection with his behavior as a father and a partner of his children's mother.

### j. Rehabilitation

While rehabilitation is not a prerequisite to relief, it is a factor an IJ would have considered seriously, particularly in a case involving a substantial criminal record. Viewed from the perspective of an adjudicator in 1996, the defendant had been committing increasingly dangerous crimes since 1989, and had committed a violent weapons offense as recently as 1995. It is unlikely that he would have been able to produce convincing evidence of rehabilitation at his 1996 hearing, despite his participation in anger management, parenting, and masonry programs while incarcerated.

### k. Balancing

The defendant's three strongest positive equities were his family ties, his residence of long duration in the United States and his arrival at a young age. In some cases, these factors have been deemed "unusual and extraordinary." *See, e.g., In re Catalina Arreguin De Rodriguez,* 21 I. & N. Dec. 38 (BIA 1995) (finding that unusual or outstanding equities included nearly 20 years of lawful residence and two minor United States citizen children). An immigration judge may even have deemed them "extraordinary" in this case. Given the force of the defendant's negative factors, however, even if he had not been required to meet the threshold for "unusual and outstanding" equities, it is highly probable that the defendant would not have prevailed at a section 212(c) hearing.

### 4. Actual Cases

Though there are analytical challenges to a court interested in availing itself of the full gamut of actual section 212(c) cases, in the present case the precedential authority is sufficient. In terms of cases from the United States Court of Appeals for the Second Circuit, the defendant's situation can be analogized closely to *Vlassis v. INS,* 963 F.2d 547 (2d Cir.1992). As discussed previously, in Part III.F.1.b, *supra,* in *Vlassis* a non-citizen sought a stay of deportation. Mr. Vlassis had pled guilty to a charge of unlawful possession of narcotics, attempted criminal sale of marijuana, and criminal sale of marijuana. He was later named in a sixteen-count indictment charging various narcotics convictions. He pled guilty to one count alleging

criminal sale of cocaine in the third degree. The Court of Appeals considered him, at the outset, to be a strong candidate for a waiver. He had come to the United States at the age of seven and lived in the United States for approximately twenty years. He spoke little Greek and had only one known relative in Greece.

The Court of Appeals in *Vlassis* nonetheless denied relief in part on the basis of a suspect employment record, where "he worked mainly for members of his family and [was] often paid 'off the books.' " *Id.* at 550. He was not able to provide substantial evidence of rehabilitation. His mother, though testifying on his behalf, did not appear to know the details of his drug problem or criminal history. The Court of Appeals was persuaded that the immigration judge and the BIA were correct to deny relief.

The defendant's criminal history appears to be more serious, and his equities less substantial, than those in almost any published BIA decision. In *Matter of Edwards*, 20 I. & N. Dec. 191 (BIA 1990), the non-citizen seeking a section 212(c) waiver of deportation had a criminal record that included various counts for attempted burglary and burglary as well as for possession of a controlled substance and possession of a controlled substance with intent to distribute. Edwards presented significant positive factors, including a history of legal employment, a wife and siblings living in the United States, the fact that he knew no one in Barbados, and that he was the father of an autistic child. Based in large part on a finding of lack of rehabilitation, the BIA denied relief.

*Matter of Roberts*, 20 I. & N. Dec. 294 (BIA 1991), is comparable to the defendant's situation. The BIA noted that the sale of cocaine constituted an extremely serious adverse factor and that, as a result, Roberts would need to establish unusual and outstanding equities. It found no unusual and outstanding equities in his case. He had resided in the United States for approximately 12 years, having entered as an adult. It noted that he had been separated from his wife and their four children since 1987, and that he was not certain of the whereabouts of his 2-year-old son. It observed that none of his family appeared to rely on him for financial support, and that his employment was irregular. Concluding that it lacked confidence in his rehabilitation, the BIA determined that he did not warrant a favorable exercise of discretion.

While the defendant has a closer relationship to his common law spouse and children, he is otherwise in a very similar situation to Mr. Roberts, with a far graver criminal record. He has never meaningfully supported his family with legal income because of his sporadic legal employment and his incarceration. While he arrived in this country at a young age and has lived here for a longer time than Mr. Roberts, he has also acknowledged over 250 drug sales, a shooting, and repeated efforts to obstruct justice.

Even when compared with unpublished BIA cases, for purposes of realistically assessing his probability of success in seeking section 212(c) relief rather than for precedential value, the defendant's criminal history is so serious that, to be counterbalanced, he would need to demonstrate positive equities substantially superior to those he has proven to date. The BIA's unpublished "close cases" were close precisely because the seriousness of the criminal conduct was in balance with positive equities. From the most generous standpoint, it would be difficult to support such a claim in the instant case.

## VI. Conclusion

Despite defendant's serious criminal record, his plight and that of his family are not without compassionate elements.

In terms of human misery, the potential impact of our immigration laws can hardly be overstated. With minor exceptions, the immigration laws operate directly and exclusively upon human beings, flesh and blood, men, women and children, whose hopes for future happiness in a realistic sense frequently depend on their ability to enter, or remain in, this land of freedom and opportunity....

The statutes themselves contain a built-in potential for hardship which is to some extent unavoidable. In carving out the general classes of aliens eligible to be admitted and to remain here, the laws obviously exclude all others who do not fit into the defined classes, with harsh results in marginal and borderline cases.

Maurice A. Roberts, *The Exercise of Administrative Discretion Under the Immigration Laws,* 13 SAN DIEGO L. REV. 144, 144–45 (1975).

By his own testimony, the defendant in the instant case is a hardened drug dealer and a violent criminal. He has admitted to selling illegal drugs hundreds of times, resulting in arrests and convictions on a range of controlled substances offenses. He has likewise acknowledged engaging in violent crime, on one occasion shooting and critically injuring an "associate." He repeatedly obstructed justice by refusing to surrender to authorities when called upon to do so and by persistently lying to police about his identity and immigration status.

Were the defendant's record less serious or his equities more substantial, the "reasonable probability" outcome may well have been different. Judge Williams himself acknowledged that it certainly would have been possible for someone who "after committing three crimes, albeit serious" ones, could have gone to prison, spent three years there, and turned "their life around [to] lead a productive law-abiding life[.]" Mar. 24, 2005 Hrg. Tr. at 131. In *United States v. Scott,* 394 F.3d 111 (2d Cir.2005), discussed above in Part III.B.1, *supra,* the United States Court of Appeals for the Second Circuit dismissed the indictment of a non-citizen charged with illegal reentry despite a lengthy criminal history, on the grounds that an immigration judge in a section 212(c) proceeding could have found that his positive equities outweighed the negative factors.

Despite substantial evidence that many individuals convicted of serious crimes were in fact granted section 212(c) relief, the court is now presented with an individual whose criminal record is extraordinary and whose equities are underwhelming. The defendant has failed to prove that there was a reasonable probability—a 20% chance, applying the inverse of the "clear, unequivocal and convincing" standard—that he would have obtained section 212(c) relief.

The indictment is reinstated.

SO ORDERED.